## Case No. 14,545.

### UNITED STATES v. BATTISTE.

[2 Sum. 240.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1835.

JURY—OF WHAT JUDGES—SLAVERY—TRANSPORTATION—MAKING SLAVES—AFRICAN NEGROES.

1. The jury have not the right, though they may have the power, in rendering a general verdict, to determine the law in any case, civil or criminal. It is their duty to follow the law as laid down by the court.

[Followed in Stettinius v. United States, Case No. 13,387. Cited in U. S. v. Morris, Case No. 15,815; U. S. v. Riley, Id. 16,164; The Saratoga, 9 Fed. 329; Re Taylor, 11 Fed. 473; Re Jayne, 28 Fed. 424; Cross v. Seeberger, 30 Fed. 428.]

[Brown v. Com. (Va.) 10 S. E. 747; Com. v. Anthes, 71 Mass. 237; Com. v. McManus, 143 Pa. 97, 22 Atl. 765; Pierce v. State, 13 N. H. 551, 566; State v. Burpee, 65 Vt. 28, 25 Atl. 972. Cited in brief in State v. Croteau, 23 Vt. 60. Cited in State v. Rheams, 34 Minn. 21, 24 N. W. 304; State v. Wright, 53 Me. 334; Territory v. Kee (N. M.) 25 Pac. 926; Williams v. State, 10 Ind. 504; Williams v. State, 32 Miss. 389.]

2. By the statutes of the United States (1820, c. 113, § 4 [3 Stat. 600]), it is declared "that if any citizen, &c. shall, on any foreign shore, seize any negro or mulatto, with intent to make such negro or mulatto a slave, or shall decoy, or forcibly bring or carry, or shall receive such negro or mulatto on board of any such ship or vessel, with intent as aforesaid, such citizen or person shall be adjudged a pirate, and on conviction thereof, &c., shall suffer death." Held, that a person having no interest in or power over the negroes,

so as to impress upon them the future character of slaves, and only employed in the transportation of them for hire from port to port, is not guilty under this act.

[Cited in U. S. v. Libby, Case No. 15,597.]

3. It is not necessary, in order to bring the case within the act, that the negroes should be free at the time of their seizure or reception on board.

4. "To make the negro a slave," in the sense of the act, is to be the instrument or means of fixing on him that character for the future.

5. An African negro or mulatto, when bought on the coast of Africa by an American citizen, or any person belonging to an American ship, ceases to be a slave, since no such person can, consistently with our laws, hold him in slavery.

Indictment for a capital offence, in being engaged in the transportation of slaves, contrary to the fourth section of the act of May 15, 1820 (chapter 113). Plea, not guilty. At the trial, the facts were substantially as follows: It appeared that John Battiste sailed from New York, in July, 1834, in the brig America, a vessel belonging to the Messrs. Hathaway, Messrs. Swain, and Mr. Grinnell of New Bedford. The America was bound to St. Helena or a market, and sailed under the command of Captain Miller. The America did not touch at St. Helena, as was intended, on account of the unfavorable winds, but proceeded directly to the coast of Africa, and first touched at Loando, or St. Paul de Loando, the capital of the Portuguese possessions in this section of Africa,—a city of some extent, and with a population variously estimated from 3,000 to 18,000. Here the America remained about three weeks, when she sailed south to Nova Redondo, and finally New Benguela, or St. Philippe. From this port she sailed to St. Helena, and after again touching at the ports above-mentioned, arrived at Nova Redondo, where for the first time she received on board twelve negro slaves as passengers. These negroes were brought to the shore hand-cuffed, and chained together, attended by two negroes, a Portuguese and a soldier. Their fetters were then taken off, and they were carried aboard the America, without making any resistance. The negroes were young, the youngest being about fourteen years of age. That afternoon they sailed for St. Philippe, and arrived the next day between two and three o'clock. The harbor-master then came on board, and the usual custom-house regulations of the place were complied with. The slaves, with some goods, were landed the next morning in one of the boats of the brig; the captain and mate going with them. The America then sailed south to Fish Bay, and returning to St. Philippe and Nova Redondo, made some traffic, and procured a quantity of ivory. Thence she sailed to Old Benguela, where she took in fourteen negroes, who were also brought in irons to the shore, attended by a crowd of the natives, among whom was a king of the tribe. Battiste again assisted in removing the fetters, and receiving them

---

[1] [Reported by Charles Sumner, Esq.]

on board the brig. They left Benguela the same evening, and sailed for Loando, where the negroes were landed; Battiste and the captain being both present at the delivery. Remaining a fortnight at Loando, they next sailed to Old Benguela, where they took in wood and fowls; and thence to Nova Redondo for ivory. At St. Philippe, where the brig next touched, they took in nineteen negroes, whom they received at the shore in irons; at Old Benguela, in the same manner they received twenty-one more negroes, in the month of December or January. On reaching Loando, they discharged this cargo in two or three boats; one of which went to the shore, and another was lost sight of among the Portuguese shipping in the harbor. All were delivered, with the exception of a little girl, taken in at Nova Redondo, who was afterwards brought by Captain Miller to New York, for which place the America sailed, after once more touching at each of the ports above-named. The America took out the usual cargo, and sold it in the usual barter-trade for gum and ivory. The ports, at which she touched, are under the Portuguese jurisdiction, and Portuguese custom-house officers and soldiers were on board during the whole time of the brig's remaining in any port. The fact of receiving the negroes, at the times and places stated, was not denied; and it was not attempted to prove, that Battiste had aided or assisted in kidnapping, or making them slaves.

J. Mills, U. S. Dist. Atty.

D. Webster and C. P. Curtis, for defendant.

The points relied on by the counsel, will be found stated in the charge of the court.

STORY, Circuit Justice, in summing up to the jury, said: Before I proceed to the merits of this case, I wish to say a few words upon a point, suggested by the argument of the learned counsel for the prisoner upon which I have had a decided opinion during my whole professional life. It is, that in criminal cases, and especially in capital cases, the jury are the judges of the law, as well as of the fact. My opinion is, that the jury are no more judges of the law in a capital or other criminal case, upon the plea of not guilty, than they are in every civil case, tried upon the general issue. In each of these cases, their verdict, when general, is necessarily compounded of law and of fact; and includes both. In each they must necessarily determine the law, as well as the fact. In each, they have the physical power to disregard the law, as laid down to them by the court. But I deny, that, in any case, civil or criminal, they have the moral right to decide the law according to their own notions, or pleasure. On the contrary, I hold it the most sacred constitutional right of every party accused of a crime, that the

jury should respond as to the facts, and the court as to the law. It is the duty of the court to instruct the jury as to the law; and it is the duty of the jury to follow the law, as it is laid down by the court. This is the right of every citizen; and it is his only protection. If the jury were at liberty to settle the law for themselves, the effect would be, not only that the law itself would be most uncertain, from the different views, which different juries might take of it; but in case of error, there would be no remedy or redress by the injured party; for the court would not have any right to review the law as it had been settled by the jury. Indeed, it would be almost impracticable to ascertain, what the law, as settled by the jury, actually was. On the contrary, if the court should err, in laying down the law to the jury, there is an adequate remedy for the injured party, by a motion for a new trial, or a writ of error, as the nature of the jurisdiction of the particular court may require. Every person accused as a criminal has a right to be tried according to the law of the land, the fixed law of the land; and not by the law as a jury may understand it, or choose, from wantonness, or ignorance, or accidental mistake, to interpret it. If I thought, that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial. But believing, as I do, that every citizen has a right to be tried by the law, and according to the law; that it is his privilege and truest shield against oppression and wrong; I feel it my duty to state my views fully and openly on the present occasion. It is not, indeed, an occasion, on which there is any reason to doubt, that an intelligent jury can understand the principles of law applicable to the subject, as well as the court; for they are the principles of common sense. And as little reason is there, in my view, to suppose, that they can operate injuriously to the real merits of the case of the prisoner.

There is no question of fact really in dispute between the parties, except the intent of the prisoner. The admitted facts are, that the prisoner was mate of the brig America, belonging to citizens of the United States, on her late voyage to the coast of Africa. The voyage, as planned by the owners, was a lawful voyage. At one or more places in the province of Angola, one of the Portuguese possessions on the coast of Africa, certain negroes were, by the order of the master of the brig (Capt. Miller) taken on board as passengers, with the assistance of Battiste, and carried to other places within the Portuguese possessions on the same coast. These negroes were carried for hire, and a certain rate of passage money; and were landed and delivered to their respective owners at the places of destination. Neither the owners nor master of the brig, nor Bat-

tiste, nor any of the crew, had any interest or property in these negroes, or in the sale of them. They did not coöperate in making them slaves, or in perpetuating their state of slavery, unless the mere transportation of them, as above-mentioned, is to be deemed such an act.

Under these circumstances, the question for the jury to decide is, whether such a transportation of these negroes is a capital offence, within the true intent of the act of the 15th of May, 1820 (chapter 113). The question is not, whether the defendant is guilty of an offence against some law of the United States; but whether he is guilty of the very offence charged in the indictment. I have no doubt, that he is guilty of a misdemeanor under the second section of the act of the 10th of May, 1800 (chapter 51 [2 Stat. 70]), as that act has been construed by the supreme court of the United States. See The Mexico, 9 Wheat. [22 U. S.] 403–406. But that is unimportant to be considered on the present occasion. The words of the act of 1820 (chapter 113, § 4), on which the present indictment is framed, are as follows: "That if any citizen, &c. or any person whatever, being of the crew or ship's company of any ship or vessel, owned in whole or in part, or navigated for, or in behalf of any citizen or citizens of the United States, shall land from any such ship or vessel, and on any foreign shore, seize any negro or mulatto, not held to service or labor by the laws of either of the states or territories, with intent to make such negro or mulatto a slave; or shall decoy, or forcibly bring or carry, or shall receive such negro or mulatto, on board of any such ship or vessel, with intent as aforesaid, such citizen or person shall be adjudged a pirate, and on conviction thereof, &c. shall suffer death." The language of this section is peculiar. In no other act is the phrase found "to make such negro, &c. a slave." See Act May 10. 1800, c. 51; Act March 2, 1807, c. 77 [2 Story's Laws, 1050; 2 Stat. 426, c. 22]; Act April 20, 1818, c. 86 [3 Story's Laws, 1698; 3 Stat. 450, c. 91]; Act March 3, 1819, c. 224 [3 Story's Laws, 1752; 3 Stat. 532, c. 101]. And the first question, which arises, is, what did congress mean by the words "to make a slave." It is the intent to make a slave, which constitutes the essence of the offence; for neither the seizing, nor forcibly bringing, or carrying, or receiving a negro on board, is any offence without such superadded intent.

It is argued by the learned counsel for the prisoner, that in order to bring the case within the purview of the act, it is indispensable, that the negro should, previously to the seizing or carrying him on board, have been free; for if he were not previously free, the party could in no just sense be said to intend to make him a slave. The onus probandi would, under such circumstances, be on the government to establish the fact of the negro being free; and, if he was already a slave, then the case was not within the act. To this interpretation of the act I cannot yield my assent. If it be well founded, the act becomes a mere nullity; and as useless an instance of inefficient legislation, as could well have been devised. It might as well be blotted out of the statute book. Congress, in passing the act, must be presumed to have been well acquainted with the nature and course of the slave trade. The known intention of all our statutes on this subject is to prohibit the traffic in African slaves, however carried on, or in other words, to suppress the slave trade on the coast of Africa. Now, by the very course of this trade, it would be almost a moral impossibility to trace out the origin, nativity, or antecedent political state of any negroes found on the coast of Africa, in the hands of the slave dealers. The negroes themselves, in regard to whom the offence should be committed, might, and ordinarily would, be transported to some other foreign country without any possible means of ascertaining their identity, or of obtaining evidence as to their previous condition, long before any prosecution could take place. In truth, the mass of all the negroes bought and sold on the coast would be found, de facto, in a state slavery; and to punish the traffic, only when it took place by proof of the sale, or carrying away of free negroes, would be to establish a prohibition in mere mockery of the avowed objects of public justice. If congress intended bonâ fide to suppress the slave trade, they must have intended to suppress the traffic in slaves, as well as in free negroes on the coast. They must have intended to cut off that, which was the common and usual trade; that, which was in its own nature capable of proof; and not such an offence, as if it existed, could scarcely admit of clear proof; or if proved, would have no real tendency to suppress the traffic.

One or two instances may be put to illustrate these suggestions. According to the argument, if an American ship should be employed in kidnapping and stealing slaves on the coast of Africa from their lawful masters, and the officers of such ship should forcibly carry them to another foreign country, and there sell them as slaves, it would not be an offence within the act. So, if an American ship should be employed in buying slaves, and carrying them to another foreign country, with an intent to sell them there as slaves; and the officers of the ship should actually sell them in such foreign country as slaves; it would also be no offence within the act. Now, I cannot but think, that these cases must have been precisely such as were within the contemplation of the very prohibition of the act of congress. If they were not, the act would be but an empty sound, and a mere nullity, in a practical sense. The construction contended for, ought not, then, to be adopted, unless it be the natural or necessary interpretation of the words. If there

be another interpretation, equally natural and perfectly consistent with the words, and carrying into effect the apparent intent of the act, that ought to be adopted in furtherance of public justice. My opinion is, that the language used, taking the whole context, requires a different interpretation from that assumed in the argument, an interpretation reasonable in itself, and, as I think, also, the true interpretation of the words. The words used are, if any person, &c. shall seize, &c. any negro or mulatto. No descriptive or qualifying words are added as to the character or condition of the negro or mulatto, whether free or enslaved; and consequently, the words being general, apply to all negroes and mulattoes, whether free or slaves. The public mischief is the same, whether the negro, &c. be a slave, or be free. In each case the slave trade is carried on; in each case it is equally important to have it suppressed. In each case the known public policy of the United States has been to suppress it.

In the next place there is an exception from the words, which demonstrates it to have been the intention of congress to include negroes, who are slaves, as well as negroes who are free, within the clause. The exception is of negroes or mulattoes, "held to service or labor by the laws of either of the states or territories of the United States." No one will doubt, that this exception was designed to exclude from the operation of the clause, slaves held to labor in the United States. An exception is always construed to exclude something otherwise within the purview of the enacting clause. The exception would have been wholly useless, if the words "negro or mulatto" would not, in their ordinary meaning, have included slaves. It being made, the legislature must be presumed to have intended to include all other slaves, than those within the exception, within the general words, "negro or mulatto." My construction of the act is this: It intended to punish, as a capital offense, the decoying or forcibly bringing or carrying or receiving on board any negro or mulatto, with intent on the part of the party, decoying, bringing, carrying or receiving, to make such negro or mulatto a slave in future, without any reference whatsoever to his antecedent state or condition, whether a slave or free. The act refers, not to any past state or condition, but to the intent of the party in future, viz. to make the negro or mulatto a slave. The offence consists, then, not merely in the fact of having originally impressed upon the negro or mulatto the character of a slave; but in impressing or continuing it for the future. "To make the negro a slave" in the sense of the act, is to be the instrument or means of fixing on him that character in future. If the words of the act had been, with intent to make the negro or mulatto an apprentice for life or for years, instead of to make him a slave, it seems to me, that there would be little difficulty in construing the act to refer to a future state, to be given or impressed by the party himself, rather than to any past state, whether bond or free. The moment an African negro or mulatto is bought on the coast of Africa by an American citizen, or by any person belonging to an American ship, he ceases to be a slave; for no American can, consistently with our laws, hold him in slavery. And if he bought him with an intent to hold or sell him as a slave thereafter, and received him on board for the purpose of so making him a slave, that would bring the party within the prohibition of the act. My opinion, therefore, is, that to convict the prisoner upon the present indictment, it is indispensable to show, that he had some title or interest in or power over the negroes in question, so as to be able to impress upon them by his own act the character of slaves in future, and that he intended so to do. If he had no title or interest in these slaves, and no such power over them; but he was merely employed in the transportation of them for hire by the owners of them from one port to another port of the Portuguese possessions, then (although it is an offence under our laws) he is not guilty of the offence charged in the indictment, even if such owners of the slaves intended to keep them in slavery in future.

My reasons for this opinion may be shortly given. These are provinces or possessions on the African coast belonging to the Portuguese government, and under the regular administration of Portuguese authorities, duly established there. We all know, that domestic slavery is established or at least recognised as a legitimate state in the Portuguese provinces and possessions. These negroes, being (as is supposed) slaves, were transported from one province or possession to another province or possession of the same sovereignty. And if such a transportation of slaves be, under the act of 1820, a capital offence, then it would be equally a capital offence under the same act for an American ship to transport a Spanish merchant with his domestic slaves, merely as passengers for hire, from one port of the Island of Cuba to another; as, for instance, from Matanzas to Havanna. The cases are exactly parallel. Now, it seems to me impossible to believe, that congress could have intended to punish capitally, as a piracy, such an act as the mere transportation of slaves from one port to another of the same country. It would confound all moral distinctions in regard to crimes. It would punish an act involving not the slightest moral turpitude, in the same manner, as it would punish the hardened atrocity, inhumanity, and horrible iniquities attending the slave trade on the coast of Africa. It would strike us all with astonishment, that congress should make the mere transportation of a negro slave, as a passenger for hire, from one port to another of the same country, an offence of equal enormity with kidnapping or stealing negroes on a for-

eign coast, and selling them to perpetual bondage in another foreign country. If we could strip the present case of the associations connected with its localities on the coast of Africa, where we know the slave trade exists with all its unnumbered horrors, there would be no difficulty in believing, that the mere act of transporting slaves, as passengers for hire, without any interest or title in them, and without any intention to fix upon them, by any personal act, the state of future slavery, could not be the offence intended by the act of congress. The transportation of slaves for hire, from one port to another of the Portuguese settlements on the coast of Africa, though it may there facilitate the operations of the slave dealer, is not in substance a different case from transporting the same slaves from one port to another in the Brazils or in Portugal.

There is another consideration, not wholly without weight in this cause. In the other acts against the slave trade, the transportation of slaves from the coast of Africa, and from one foreign country to another, is in express terms prohibited. See Act 1800, c. 51, § 2; Act 1807, c. 77, § 4; Act 1818, c. 86, § 4. If the legislature had intended to increase the punishment, and to make the mere transportation of slaves a capital offence, it would be natural to expect, in the present act, some language significant of that intent, like that found in the former acts. The very omission, therefore, of the appropriate phraseology, furnishes a presumption, that the legislature had some other and different offence in their view.

Mem. After this charge the jury found a verdict of not guilty for the prisoner. He was afterwards indicted on the second section of the act of 1800 (chapter 51), and was admitted to plead nolo contendere; and thereupon he received sentence for the offence.