UNITED STATES of America

v.

Frank GORHAM, Jr., Appellant.

UNITED STATES of America

v.

Otis D. WILKERSON, a/k/a Robert N. Jones, a/k/a James Burgess, Appellant.

Nos. 74–1611 and 74–1613.

United States Court of Appeals, District of Columbia Circuit.

Argued March 12, 1975.

Decided Nov. 28, 1975.

Jack L. Lipson, Washington, D. C. (appointed by this court), for appellants.

Paul N. Murphy, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., John A. Terry, John O'B. Clarke, Jr., and Lester B. Seidel, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and MacKINNON and ROBB, Circuit Judges.

Opinion for the court filed by Circuit Judge MacKINNON.

Concurring opinion filed by Chief Judge BAZELON.

MacKINNON, Circuit Judge:

Appellants Frank Gorham, Jr., and Otis D. Wilkerson (a/k/a Robert N. Jones) were indicted, along with co-defendants Meltonia Fields and Linda Ewing, on counts of conspiracy, introducing contraband into a penal institution, armed kidnapping, and armed robbery, and both appellants were indicted individually on counts of attempted escape and escape from custody. The charges grew out of appellants' abortive attempt to escape from the D.C. jail on October 11, 1972, and their successful escape two weeks later. At a trial before Judge Gasch appellants were convicted on a majority of the counts against them, as was a fifth co-defendant, Terry Burgin; Fields and Ewing were acquitted of all charges.

Because certain testimony which may have contributed to appellants' convictions was adduced to demonstrate the women's innocence, appellants now urge reversal of their convictions, citing the District Court's allegedly erroneous and prejudicial refusal to sever the trials of these various defendants. They also contend that the October 11 escape attempt and the October 25 escape were disparate offenses which warranted separate trials and which were improperly joined in the indictment. Thus they allege that the trial court's refusal to sever the trial into offenses relating to the separate dates was erroneous. Finally, appellants protest the trial judge's decision to exclude an agreement not to take

retributive action extracted from D.C. Corrections Director Kenneth Hardy after severe beating and under threat of death. We find no merit to these contentions and no error in the trial, and thus affirm all convictions on all counts.

### (1) *Background*

For some time prior to October 11, 1972, while appellants Gorham and Wilkerson, a/k/a Robert Jones [hereinafter Jones], were confined as inmates at the District of Columbia jail, they conspired to escape from that facility and, in furtherance of the plan, obtained a loaded .38 caliber pistol. In the early morning hours of October 11, 1972, Jones feigned sickness, and when two correction officers entered his cell to assist him, Gorham assaulted them with the pistol and took them as hostages. Gorham and Jones proceeded to take control of the entire cellblock and to release other prisoners to assist them in obtaining additional hostages, eventually including Kenneth L. Hardy, District of Columbia Corrections Director. In furtherance of their demand that they be released, appellants made numerous threats of violence against their hostages, used some of them as shields and with the inmates who had joined them employed other strategems in pursuit of their freedom. All their efforts were thwarted, and the jail authorities eventually reacquired control of the cellblock and the entire jail complex.

In the aftermath of this episode Gorham and Jones were transferred to the maximum security "Penthouse" area of the jail. While they were confined there appellants obtained several hacksaw blades, sawed through two iron bars in a window, and on October 25, 1972, effected their escape by means of "a makeshift Jacob's ladder, fashioned from bedsheets in the classical manner." [1]

### (2) *The Charges*

These events led to a twenty-count indictment against Gorham, Jones and two co-defendants, Meltonia M. Fields and Linda F. Ewing. Ewing claimed to be a sister of Jones and Fields was a friend of Gorham. Neither woman was an inmate of the jail but both were charged in the indictment with conspiracy and with having assisted Gorham and Jones in their attempted escape and in their actual escape. Ewing visited Jones on the day before the attempted escape and a woman of the same size and with the same features as Fields visited Gorham one day before Gorham and Jones succeeded in escaping (Tr. 1224–5, 1240–1).

The first count of the indictment charged Gorham, Jones, Fields, and Ewing with participation in an unlawful conspiracy prohibited by 18 U.S.C. § 371 to escape and cause the escape of persons from the custody of the Attorney General in violation of 18 U.S.C. § 751(a); to introduce contraband into a District of Columbia penal institution in violation of D.C. Code § 22–2603; to kidnap correctional officers in violation of D.C. Code § 22–2101; and to harbor and conceal an escaped prisoner in violation of 18 U.S.C. § 1072. The overt acts alleged, *inter alia,* related to both the attempted escape on October 11, 1972, and to the actual escape on October 25, 1972.

The second count charged that the same four defendants on or before October 10, 1972, introduced the .38 caliber pistol and bullets into the jail in violation of D.C. Code § 22–2603.

Counts three through fourteen charged the same four defendants, while armed, with conspiracy to kidnap and with the actual kidnapping of 12 hostages (Correction Department personnel) with the intent to hold them for the purpose of effecting the escape of Gorham and Jones from the jail in violation of D.C. Code §§ 22–2101, 3202. The fifteenth count charged the four with armed robbery in stealing certain clothes and keys in violation of D.C. Code §§ 22–2901, 3202.

Counts 16 and 17 charged Gorham and Jones respectively with attempted escape from the jail on October 11, 1972, in violation of 18 U.S.C. § 751(a). The

---

1. Appellee's Brief at 28.

eighteenth count charged that on or about October 24, 1972, the four defendants introduced contraband hacksaw blades into the jail in violation of D.C. Code § 22–2603. The nineteenth and twentieth counts charged Gorham and Jones respectively with escape from the jail on October 25, 1972, in violation of 18 U.S.C. § 751(a).[2]

### (3) The Trial

At the trial Fields and Ewing were acquitted of all charges and appellants Gorham and Jones were convicted on almost every count. Gorham was found not guilty of the kidnapping of Kenneth Hardy (count 14) and not guilty of introducing contraband into the jail (counts 2 and 18). Jones was acquitted of the same offenses but was found guilty of the robbery, a lesser included offense of the armed robbery alleged in the fifteenth count.

### (4) The Appeal

The appeal by Gorham and Jones asserts that three questions are at issue:

First: Whether it was error for the trial court to refuse to grant separate trials to appellants when the evidence presented by their co-defendants at a multi-defendant trial was antagonistic and prejudicial to appellants.

Second: Whether it was error for the trial court to refuse to grant separate trials as to disparate offenses where the effect of a joint trial of the offenses was prejudicial.

Third: Whether it was error for the trial court to exclude evidence that the government was bound not to take action against appellants in connection with the events for which they were indicted.

Appellants' Brief at 1–2. These issues will be considered in order.

### (5) The Refusal to Grant Separate Trials

Appellants argue that they were prejudiced by the trial court's refusal to sever their trials from those of Fields and Ewing, since the women's "lines of defense . . . diverged from that of appellants, and as a result, the principal witness [Seegers] who testified for the women was antagonistic to Gorham and Jones." Appellants' Brief at 10. To understand the basis of this claim it is necessary to review some of the evidence.

As part of its case in chief the Government called one James Bridgeman, a prisoner at the jail at the time of the October 11 uprising and an appellant in a related case stemming from that event.[3] Bridgeman testified (Tr. 446 *et seq.*) that in September and October he, Jones, and Gorham talked over a plan for escaping from the jail. They "decided to have arms brought into the jail. The original idea was to have three pistols smuggled in" (Tr. 448). These conversations took place "around the last of September or the first of October" (Tr. 448). The plan was to have pistols "brought into the rotunda of the jail on some kind of special visit" (Tr. 449, 450) by someone "named Linda or somebody named Meltonia" (Tr. 451). The scheme was to have the chaplain arrange a "special visit" (Tr. 451). In a special visit "the person that is visiting is allowed to make contact" (Tr. 457). On October 10, Jones had a visitor and immediately thereafter Bridgeman saw in Jones' possession a gun, which he identified as similar to the gun later used by Gorham and Jones (Tr. 453, 454, 450). Bridgeman testified that Jones had the pistol when he came back from the visit (Tr. 479, 480).

In his defense Gorham called as a witness one Kenneth May. May testified on direct examination, contrary to Bridge-

**2.** A seventeen-count indictment charging Terry L. Burgin with substantially the same offenses was consolidated for trial with the indictments of Gorham, Jones, Fields, and Ewing. Burgin was not charged with introduction into the jail of the gun (count 2) or hacksaw blades (count 18), nor was he charged with escape. Count 2 in the Burgin indictment alleged his attempted

escape on October 11, 1972. It is not necessary to discuss further the trial with respect to this indictment.

**3.** *United States v. Bridgeman*, 173 U.S.App. D.C. —, 523 F.2d 1099 (No. 74–1475, filed April 23, 1974).

man's testimony, that Bridgeman had told him that the gun "came over the wall of CB–2 rec. yard" (Tr. 1678). May stated that Bridgeman had told him that he was going to "shift all the weight" of the offense to Frank Gorham when he testified at trial (Tr. 1678). Later, Linda Ewing called in her defense one Robert Seegers, who testified on direct examination that on October 2, 1972, he had been present in the recreation yard when Frank Gorham picked up a paper bag containing a gun similar to the one used on October 11 (Tr. 1740–44). Cross examination by the Government, although lengthy, added little to the substance of this testimony.

On this appeal Gorham and Jones complain that they were fatally prejudiced by the testimony of Seegers. They contend that his testimony, particularly that given on cross-examination, injected a new conspiracy theory into the case, a theory that was inconsistent with the one advanced by the Government. This result would have been avoided, say the appellants, if their cases had been severed from the cases of the two women.

We may answer this contention in two ways: by pointing out that the case law does not support their claim, and by demonstrating that under the circumstances of this case the trial court's admission of the testimony in support of an allegedly divergent conspiracy theory was not erroneous.

Rule 8(b) of the Federal Rules of Criminal Procedure clearly permits joinder of the trials of defendants charged with the joint commission of related offenses by allowing that such defendants may be indicted together, as appellants were in this case. 8(b) provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or

offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

The relevant legal standard is that failure to grant severance is reversible error where "the defendants present conflicting and irreconcilable defenses and there is a danger that the jury will unjustifiably infer *that this conflict alone* demonstrates that both are guilty." *Rhone v. United States,* 125 U.S.App.D.C. 47, 48, 365 F.2d 980, 981 (1966); *United States v. Robinson,* 139 U.S.App.D.C. 286, 289, 432 F.2d 1348, 1351 (1970) (emphasis added).

■ There was no irreconcilable conflict in this case, certainly none of which *itself* would create an inference of guilt. Appellants merely speculate that evidence showing that a gun used in the escape was thrown over the wall rather than smuggled in by Linda Ewing simultaneously exculpated the women and inculpated appellants. Appellants attempted to undermine the credibility of James Bridgeman, the witness who testified that the gun was tossed into the jailyard, and only after that attempt had apparently failed did they move for severance of the trials because of the antagonism to their own position of evidence presented in behalf of the women. This antagonism cannot be equated with an irreconcilable conflict which by itself suggests guilt. Instead, as the Government argues, appellants espouse the thoroughly discredited proposition that they "might have had a better chance of acquittal if tried separately." *United States v. Wilson,* 140 U.S.App.D.C. 220, 227, 434 F.2d 494, 501 (1970). Moreover, a denial of severance "is not to be disturbed on appeal unless clear abuse of the judge's discretion can be shown." *United States v. Hopkins,* 150 U.S.App. D.C. 307, 310, 464 F.2d 816, 819 (1970), and cases cited therein.[4]

4. *See also United States v. Gambrill,* 146 U.S. App.D.C. 72, 83, 449 F.2d 1148, 1159 (1971);

The decision to grant a severance of defendants properly joined for trial is one over

The claim that introduction of an alternative theory concerning the securing of the gun was prejudicial error flies in the face of reason as well as the case law. In the first place, Gorham himself, through the testimony of May, sought to show that the gun had been delivered in the recreation yard, and not by a visitor in the chaplain's office. Thus the testimony offered by Ewing and that advanced by Gorham were not fact divergent. Second, evidence that Gorham obtained a gun in the recreation yard was admissible as part of the Government's case on the conspiracy count, as the conspiracy count in the indictment did not restrict the Government to proving any particular mode for the "smuggling of a pistol." The overt act alleged in the indictment—alleged as *an* overt act *among others*—was only that appellants "while confined in the jail, procured a loaded .38 caliber pistol." And the broad allegation of the conspiracy count was that four defendants "did unlawfully . . . conspire among themselves, with each other and *with others, known and unknown* . . . ." Seegers' testimony was consistent with these charges. Moreover, from the point at which Gorham accosted the guards with the .38 caliber gun in Jones' cell, at the beginning of the entire episode, the transcript is replete with testimony that appellants had procured such a pistol. The pistol itself was admitted as an exhibit at trial. Thus there was an abundance of evidence and testimony to support the allegations of the conspiracy count with respect to the pistol. Third, May's testimony tended to corroborate Bridgeman's testimony that the original plan was to obtain three guns. Fourth, the contention that Seegers would not have testified if the cases of Fields and Ewing had been severed is completely speculative. The Government was aware of Seegers' testimony, he had testified for the Government in other trials arising out of this incident,[5] and the Government could have called him as its own witness had it considered his testimony essential to its case.

■ Thus, we conclude that the defense theories advanced by the respective defendants below were generally consistent, and to the extent that they were not, the divergence led to insubstantial prejudice and was justified by the breadth of the Government's conspiracy allegations.[6]

### (6) *The Joinder of the Attempt with the Actual Escape*

■ Appellants also argue that the October 11 escape attempt and the October 25 escape are "disparate offenses" whose joint trial was prejudicial.

They contend that:

[W]ith the jury's acquittal of Fields and Ewing, the government lost the necessary tie that might otherwise have connected the events of October 11 with those of October 25, 1972. Without that linkage, we are left with disparate offenses. Unlike the October 11 disturbance, no weapons or hostages were involved in the October 25 escape, there was no disturbance, no threats, no robbery, no identity of par-

---

which the trial court possesses great discretion and exercise of that discretion will be reversed on appeal only when it is shown to have been clearly abused. The general rule is that defendants charged with jointly committing a criminal offense are to be jointly tried.

*And see United States v. Leonard,* 161 U.S. App.D.C. 36, 46, 494 F.2d 955, 965 (1974) (a decision on severance "will be reversed only upon an affirmative showing that the district court clearly abused [its] discretion and that a defendant was prejudiced thereby").

5. Seegers had testified at the trial of Bridgeman and his co-defendants, *see* note 3 *supra,*

the first of three trials arising out of the October 11 uprising at the D.C. jail.

6. Because of the secretive nature of conspiracies, less particularity is required in their pleading and proof than would be required in other criminal cases; for example, allegations and proof that certain acts were committed by unknown persons at unknown places are generally permissible. *Brown v. Elliott,* 225 U.S. 392, 401–402, 32 S.Ct. 812, 56 L.Ed. 1136 (1912); *Woitte v. United States,* 19 F.2d 506, 508 (9th Cir.), *cert. denied,* 275 U.S. 545, 48 S.Ct. 84, 72 L.Ed. 417 (1927); *United States v. Merrick,* 207 F.Supp. 929, 930 (W.D.Mo.1962).

ticipants, and no similarity in the methods used.

Appellants' Brief at 24–25.

To sustain this challenge, appellants must demonstrate that joinder of the two offenses was improper under the standard of Federal Rule of Criminal Procedure 8(a), which provides:

> *Joinder of Offenses.* Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the *same or similar character* or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of *a common scheme or plan.*

(Emphasis added). Because the Government presented in logical and deliberate fashion the events leading up to and connecting the attempt and the actual escape—including numerous changes of address by Field and Ewing and their repeated visits to appellants at D.C. jail—and because the jury, in separate and distinct verdicts, found the appellants were engaged in a conspiracy to escape, any claim that the two events were not sufficiently related to come within the language of Rule 8(a) must fail.

As for the substantive counts, attempted escape and escape are closely related offenses: the former necessarily precedes and is a lesser included offense of the latter. The two offenses here arose out of a continuing state of affairs, *i. e.,* appellants' dissatisfaction with their confinement in jail and their strong desire to escape, manifested by the uncontradicted basic facts that appellants on October 11th *did* attempt to escape and on October 25th *succeeded in* escaping. The testimony proving such facts was not of such nature as to be likely to confuse the jury, *cf. Drew v. United States,* 118 U.S.App.D.C. 11, 19, 331 F.2d 85, 93 (1965), and the uncontradicted evidence of prior planning which flows from appellants' use of a gun on October 11 and hacksaw blades on October 25 and from visits from appellants'

female friends a day before each event is clearly sufficient to support the jury's verdict that there existed a continuing conspiratorial agreement. It is accordingly our opinion that the events and offenses of October 11th and October 25th were under Rule 8 properly joined in the same indictment.

### (7) *Immunity and the Hardy Note*

Toward the conclusion of the October 11 escape attempt, D.C. Corrections Director Kenneth Hardy was compelled, by threats and by physical violence which ultimately sent him to the hospital, to sign an agreement not to take retributive action against prisoners involved in that uprising. Appellants' final contention is that the Hardy agreement should have been admitted into evidence at their trial either as a conclusive defense to their prosecution, or to permit the jury to reach a "conscience verdict" resulting in so-called jury nullification.

This claim has a bizarre background. On October 11, three and a half hours after eleven correctional officers had been taken hostage by the rebellious prisoners, Director Hardy entered the cellblock held by appellants and their cohorts and was promptly captured. During the next twelve hours he was the object of numerous dramatic threats; at various times inmates held a pistol to his head, bound and beat him on the arms, hands and head with a hammer and a metal chair leg, placed a noose around his neck, all the time demanding that he "negotiate" the release of the other hostages. Through physical abuse and constant threats he was eventually induced to sign the following note presented to him by his captors:

> I, Kenneth Hardy, Director of the Department of Corrections of the District of Columbia, hereby promise that there will be no reprisals of any kind, including no deadlock, nor will I bring any court action against any of the inmates involved in the action that has taken place on October 11, 1972 at the D.C. Jail. The inmates will be continued in their present location pending any court action.

In determining what force and interpretation to accord this document, which was presented at trial by way of a proffer, we look first to Hardy's own explanation, previously offered at a pretrial hearing in the related case of *United States v. Bridgeman,* No. 852–73 (D.D. C.), before the same judge who tried this case:

> At the time I signed the statement, I was the Administrator of the Department internally controlled affairs [*sic*]. Attica was on my mind. I had learned eleven hostages and inmates [were] in cellblock one whose lives were in danger. I signed this [statement] to state there would be no reprisal on the part of the [jail] staff, meaning that the men would not run—run the gauntlet as had been alleged at Attica, that men would not be put in permanent deadlock, and that I intended not to take any statutory good time from any of those men who were sentenced prisoners. (Transcript of February 6, 1974, at 57.)

> [T]his is all I had the authority to do, was not to take any reprisals or any vengeance or vindictive action. . . I would not initiate any court action. (Transcript of February 6, 1974, at 75.)

> All I know is that the paper came from the inmates, but as I said, it came from an attorney and I narrowed it down either to Attorney Goldfarb or Attorney Julian Tepper. It came from the left hand side of the table. I looked at it and seen that no reprisals [*sic*], and I did not want anybody beaten, anybody run the gauntlet, anybody put in the hole or deadlock. This is what I was talking about, administrative things, not beyond that. (Transcript of February 6, 1974, at 71.)

> \* \* \* \* \* \*

> [T]here was crisscrossing of conversations, dialogue that went on which I was not fully into, and as I said before, I wasn't fully into it because I was tired. (Transcript of February 6, 1974, at 89.)

We also note the transcript of an emergency hearing before District Judge William J. Bryant, convened the evening of October 11 when six armed inmates took Hardy, still their hostage, to the United States Courthouse to ventilate their grievances. Judge Bryant allowed the six to express their complaints and listened to their hopes concerning resolution of the uprising; on October 13, in a pending civil case involving conditions at the jail,[7] he issued the following order:

> 3. Defendants, their agents and employees, shall take no action, nor make any threat of action, to injure or harass any inmate because of actions arising out of the disturbance at the District of Columbia Jail on October 11 and 12, 1972.

At their trial on March 28, 1974, appellants expressed a desire to subpoena Judge Bryant as a witness. Judge Gasch stated:

> Judge Bryant will not be subpoenaed. I have talked to Judge Bryant about this. Judge Bryant made it very plain to me the circumstances under which he issued his order. No reprisals were to be taken administratively concerning these people. He said he had no authority to enjoin the Attorney General or the U.S. Attorney. That is the thrust of what was sought to be proved in the first trial through Mr. Hardy. Mr. Hardy agreed with that. (Tr. 1649.)

Judge Gasch had previously ruled on the effect of the Hardy note in another case raising the same issue, the first of the three trials of inmates indicted for offenses committed during the October 11 uprising. *United States v. Bridgeman,* Criminal No. 852–73 (D.D.C., filed February 8, 1974). There Judge Gasch decided that neither the Hardy statement nor Judge Bryant's order precluded the United States Attorney from initiating criminal prosecutions against the inmates.

---

7. *Campbell v. Magruder* (D.D.C., Civil Action No. 1462–71).

First, we do not find Judge Gasch's reference to his conversation with Judge Bryant to have been improper: in view of his earlier decision interpreting the same note in a different case, his statement was a permissible reply to the proffer made by appellants' attorneys during their bench conference. He apprised them of a material fact he had come to know through performance of his official duties, and it was proper, if not required, that he disclose it to them. We cannot accept appellants' argument that Judge Gasch's statement disclosed an improper consideration of evidence outside the record. It was related to the proffer and was clearly material to that bench discussion.

Second, we agree with Judge Gasch that Kenneth Hardy had not promised the rebellious inmates immunity from prosecution, and find that in any event neither Hardy nor Judge Bryant was vested with the authority necessary to make such a grant. For this principle we may look to the Eighth Circuit's decision in *Isaacs v. United States*, 256 F.2d 654, 661 (8th Cir. 1958), a case which presents facts much more favorable to the granting of immunity than those we confront here. Isaacs asserted his Fifth Amendment right to refuse to testify before a grand jury. District Judge Donovan, acting freely and without any duress, granted Isaacs immunity and ordered him to testify. Isaacs refused and was held to be in contempt of court. That decision was appealed, and Chief Judge Gardner, writing for a unanimous panel, ruled that absent statutory authority, the judicial power of the federal courts does not include authority to grant immunity from prosecution for criminal offenses.

The holding in *Isaacs* was premised on the rule that the power to grant immunity resides in the executive and the legislature, *McCarthy v. Arndstein*, 266 U.S. 34, 42, 45 S.Ct. 16, 69 L.Ed. 158 (1924), and upon the principle that federal prosecutors do not possess such authority in the absence of a statute specifically conferring it, *United*

*States v. Ford*, 99 U.S. 594, 606, 25 L.Ed. 399 (1878). The Supreme Court's decision in *Ex parte United States*, 242 U.S. 27, 37 S.Ct. 72, 61 L.Ed. 129 (1916), reinforced this latter principle. Confronted with a conviction for a crime calling for a mandatory sentence, the trial judge below had suspended execution of the sentence and placed the offender on probation. Since this action preceded the enactment of the Probation Act, the question was squarely presented whether federal trial courts had inherent judicial power to obviate criminal punishment. A unanimous Court found the grant of probation to be *ultra vires* and not within the inherent judicial powers of the federal courts. Reasoning by analogy, Chief Justice White posited the issue presented here.

> [T]he disregard of the Constitution which would result from sustaining the proposition is made if possible plainer by considering that, if it be that the plain legislative command fixing a specific punishment for crime is subject to be permanently set aside by an implied judicial power upon considerations extraneous to the legality of the conviction, it would seem necessarily to follow that *there could be likewise implied a discretionary authority to permanently refuse to try a criminal charge because of the conclusion that a particular act made criminal by law ought not to be treated as criminal.* And thus it would come to pass that the possession by the judicial department of power to permanently refuse to enforce a law would result in the destruction of the conceded powers of the other departments and hence leave no law to be enforced.

242 U.S. at 42, 37 S.Ct. at 74. Thus the Court decided that federal judges do not possess any inherent power to grant probation or to grant immunity by "a [refusal] to enforce a law." The source of this power must be legislative.

In 1893 Congress enacted an immunity statute for certain *witnesses* before the Interstate Commerce Commission, Act of Feb. 11, 1893, c. 83, 27 Stat. 443, and

that statute was upheld in *Brown v. Walker*, 161 U.S. 591, 16 S.Ct. 644, 40 L.Ed. 819 (1896). This principle was subsequently extended by section 205(e) of the Motor Carriers' Act. 49 U.S.C. § 305(d). *Brown v. United States*, 359 U.S. 41, 44–45, 79 S.Ct. 539, 3 L.Ed.2d 609 (1959). Later, with the Immunity Act of 1954, 18 U.S.C. § 3486 (68 Stat. 745), Congress authorized federal District Courts to grant immunity to certain *potential witnesses* upon application of the United States Attorney acting with the approval of the Attorney General. *Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956). The present Federal Immunity Act similarly authorizes United States District Courts in certain circumstances to grant immunity from prosecution to witnesses called by the Government to testify before Congress, courts, grand juries and United States agencies. 18 U.S.C. § 6001–6005, P.L. 91–452, Oct. 15, 1970, 85 Stat. 926 *et seq.*

■ The inmates at the D.C. jail who rebelled on October 11, 1972, clearly do not come within the purview of any of the federal statutes authorizing grants of immunity to witnesses. Without such statutory authority, neither Judge Bryant nor the United States Attorney could make a binding promise of immunity to appellants or any other participants in the uprising. We thus conclude that the United States Attorney was not precluded from indicting appellants by Kenneth Hardy's note or Judge Bryant's interpretation of it. Even if the Attor-

ney General possessed the authority appellants would ascribe to him, Hardy served as the Attorney General's agent only for the purpose of exercising custody over certain designated prisoners, and not for the purpose of exercising any prosecutorial discretion. This conclusion is further buttressed by elementary principles of contract law, principles underlying the decision in *Santobello v. New York*[8] and its progeny which appellants urge us to follow. Had a promise that prosecution would not ensue been offered to appellants, it would have lacked the consideration of a knowing relinquishment of a constitutional right, involved the performance of a pre-existing duty, been voidable because of inducement by duress, and, because bargains involving the forbearance of prosecution are contrary to public policy, it would have been *nudum pactum.*[9]

### (8) *Immunity and the Jury*

■ As a last hope, appellants insist their convictions should be reversed because of the trial judge's refusal to admit Kenneth Hardy's note and Judge Bryant's statement into evidence, in order that the jury might assert what is claimed to be its "independent role in our judicial system" by returning a "conscience verdict" of acquittal consonant with "community values."[10] They claim to find support in a statement of Justice Holmes in *Horning v. District of Columbia*, 254 U.S. 135, 138, 41 S.Ct. 53, 54, 65 L.Ed. 185 (1920), that "the jury has the power to bring in a verdict in the teeth

---

**8.** 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

**9.** 5 *Williston, Contracts* § 1605 (rev. ed. Williston & Thompson 1937) states the applicable rule of law:

The tendency of the modern cases, and undoubtedly the correct rule is that any unlawful threats which do in fact overcome the will of the person threatened, and induce him to do an act which he would not otherwise have done, and which he was not bound to do, constitute duress. . . . Under such circumstances:

Where the duress of one party induces another to enter into a transaction, the nature of which he knows or has reason to know,

and which he was under no duty to enter into, the transaction is voidable against the former and all who stand in no better position . . . .
*Restatement, Contracts* § 495 (1932); *id.,* § 493(a)(e).
Both the Hardy note and the court order by Judge Bryant were obtained under duress. Corbin also points out that agreements to forebear from prosecution of criminal offenses are contrary to public policy and thus are *nudum pactum.* 6A *A. Corbin, Contracts* § 1421 (1963).

**10.** Appellants' Brief at 36–38.

of both law and facts." Their claim is that evidence of Hardy's alleged grant of immunity might have led the jury to exonerate them, in spite of the fact that Hardy's note was of no legal import and was obtained by patently illegal means.

Their argument is tantamount to the assertion that traditional principles concerning the admissibility of evidence should be disregarded, and that extraneous factors should be introduced at trial to become part of the jury's deliberations. Of course a jury can render a verdict at odds with the evidence and the law in a given case, but it undermines the very basis of our legal system when it does so. The right to equal justice under law inures to the public as well as to individual parties to specific litigation, and that right is debased when juries at their caprice ignore the dictates of established precedent and procedure. Judge Leventhal noted in *United States v. Dougherty,* 154 U.S. App.D.C. 76, 96, 473 F.2d 1113, 1133 (1972):

> This so-called right of jury nullification is put forward in the name of liberty and democracy, but its explicit avowal risks the ultimate logic of anarchy.

In that case a panel of this court held that a trial judge need not deliver an instruction explaining the process of jury nullification. *Id.* at 99–100, 473 F.2d at 1136–37. *See also United States v. Moylan,* 417 F.2d 1002 (4th Cir. 1969), *cert. denied,* 397 U.S. 910, 90 S.Ct. 908, 25 L.Ed.2d 91 (1970); *United States v. Battiste,* 2 Sum. 240, 24 F.Cas. 1042, (No. 14, 545) (D.Mass.1835).

Judge Gasch determined that Kenneth Hardy's note and Judge Bryant's order were irrelevant to the issue of appellants' guilt or innocence of the offenses charged, and thus declined to admit them into evidence. We approve his determination and agree that introduction of the note would have been unnecessari-

ly confusing and potentially prejudicial. His ruling was consonant with a statement offered by Justice Harlan in 1895, following an exhaustive analysis of cases involving the alleged power of jury nullification:

> [I]t was the duty of the court to expound the law and that of the jury to apply the law as thus declared to the facts as ascertained by them. In this separation of the functions of court and jury is found the chief value, as well as safety, of the jury system. Those functions cannot be confounded or disregarded without endangering the stability of public justice, as well as the security of private and personal rights.

*Sparf and Hansen v. United States,* 156 U.S. 51, 106, 15 S.Ct. 273, 295, 39 L.Ed. 343 (1895). The articulate wisdom of that decision has not been eroded by the passage of time.

(9) *Conclusion*

We find no error in the trial court's decision to try appellants with their codefendants below, nor can we fault the decision to combine the events of October 11 and October 25 in one trial. Finally, we approve the trial court's refusal to admit into evidence matters which bore no legal relation to the charges on which appellants were tried. For these reasons we affirm the judgments of conviction for both defendants on all counts.

*Judgment accordingly.*

BAZELON, Chief Judge (concurring):

I concur in parts (1)–(7) of the court's opinion, and in the result of part (8). The issue addressed in part (8) is whether evidence must be admitted when its *only* relevance is to enable a jury to decide whether to exercise its nullification power.[1] In my opinion, the record in this case is plainly inadequate for deciding that issue.

1. That issue was not decided in *United States v. Dougherty,* 154 U.S.App.D.C. 76, 473 F.2d 1113 (1972), which holds only "that a trial judge need not deliver an instruction explain-

ing the process of jury nullification." (173 U.S.App.D.C. page ——, 523 F.2d page 1098, *supra*)

Appellant's entire claim is based on the trial court's denial of a codefendant's request that Judge Bryant be subpoenaed to testify. (Tr. 1649) The codefendant made no proffer of evidence, nor did he explain the reasons for requesting the subpoena. The appellants gave no indication that they joined in the request. Most important, none of the defendants objected to the trial judge's ruling after he explained that he had spoken to Judge Bryant and had been informed by Judge Bryant that his order of October 13 was not intended to bar prosecution.

Since there was neither a proffer nor an objection, the only question properly before us is whether the refusal to grant the subpoena—or admit the evidence—constitutes plain error, "affecting substantial rights."[2] Since we cannot place the trial court's decision within that category, I join in affirmance.

2. Fed.R.Crim.Pro. 52(b); *cf. Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).