Thomas **PALERMO** and Sheldon Saltzman, Petitioners-Appellees,

v.

**WARDEN, GREEN HAVEN STATE PRISON,** Respondent-Appellant,

and

**Russell Oswald et al., Defendants-Appellants.**

Nos. 1341, 1342, 1343, Dockets 76–2055, 76–2060, 76–2063.

United States Court of Appeals, Second Circuit.

Argued July 22, 1976.

Decided Nov. 1, 1976.

---

Nancy Rosner, New York City (Elliot A. Taikeff, New York City, of counsel), for appellee Palermo.

Harry L. Simmons, New York City, for appellee Saltzman.

Ralph McMurry, Asst. Atty. Gen. of N. Y., New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, of counsel), for State appellants.

Before WATERMAN and MESKILL, Circuit Judges, and BARTELS, District Judge.*

MESKILL, Circuit Judge:

In 1970, Thomas Palermo and Sheldon Saltzman, both New York State prisoners, brought suit against a multitude of officials seeking, *inter alia*, damages for alleged nonfulfillment of a negotiated plea agreement and immediate release from prison under 42 U.S.C. §§ 1983, 1985. Judge Mansfield, then a district judge, held that the complaint stated a valid claim against Parole Commissioners Russell Oswald and Howard Jones and other parole commissioners named as John Doe defendants, and against New York City Police Detective John O'Connor. The district court dismissed the complaint as to Queens District Attorney Thomas Mackell and Chief Assistant District Attorney Frederick Ludwig for failure sufficiently to allege justifications to abrogate prosecutorial immunity. *Palermo v. Rockefeller*, 323 F.Supp. 478 (S.D.N. Y.1971).[1] No final judgment was entered as to the dismissed defendants. Five years later, on April 19, 1976,[2] trial commenced on

---

* Of the Eastern District of New York, sitting by designation.

1. Plaintiffs then filed an amended complaint against these defendants, which Judge Mansfield dismissed on July 26, 1971. The case thus was left in the same posture as after the first decision.

2. In the interim, pursuant to the Supreme Court's decision in *Preiser v. Rodriguez*, 411 U.S. 475, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973), plaintiffs' § 1983 claim for injunctive relief in the form of release from prison was treated as a habeas corpus petition. The Attorney General of the State of New York then moved for dismissal of that aspect of the case, alleging

Palermo's habeas claim before Judge Griesa and on the damage claim by both plaintiffs against the parole commissioners and Detective O'Connor before a jury. Upon the trial's conclusion on April 22, 1976, Judge Griesa held that there was insufficient evidence to submit any of the damage claims to the jury and dismissed the case against Oswald, Jones and O'Connor.[3] Granting Palermo's application for a writ of habeas corpus, the district court concluded that the prosecuting authorities negotiated a plea bargain in bad faith and failed to fulfill the promises made. The court ordered Palermo's unconditional release without parole as the only meaningful form of relief.

On appeal, the State raises seven claims of error: (1) that the findings of the district court that Palermo was induced to plead guilty by representations not carried out were clearly erroneous; (2) that the return of stolen property was unlawful consideration which could not support a plea bargain; (3) that Palermo materially breached his obligations by failing to return all of the stolen property; (4) that any parole promises made were *ultra vires* and not binding on the State; (5) that the relief afforded was unlawful and inappropriate; (6) that the dismissal in favor of Mackell, Ludwig and others should have been entered *nunc pro tunc*; and (7) that the district court abused its discretion in denying defendants Jones and Oswald costs and attorney's fees. In addition, Palermo and Saltzman appeal from the 1971 dismissal of the damage claim against Mackell and Ludwig. For the reasons stated below, we affirm.

## I. *The District Court's Findings.*

The State contends that the findings of the District Court are clearly erroneous because it failed to consider critical facts, primarily the extraordinary role played by Palermo's attorneys, and because it "chose to believe all plaintiffs' witnesses and none of respondent's witnesses." The basic chronology of events is not in dispute. On the morning of February 17, 1969, several men robbed the Provident Loan Society ("Provident") in Queens County of several millions of dollars worth of jewelry which had been pledged by more than 2,000 Queens residents to the Provident as collateral for loans. That same morning, Palermo and Saltzman were scheduled for trial for an armed robbery which previously had occurred in Richmond County. The two men did not appear for trial until mid-day. In late February, 1969, both men were found guilty of the Richmond robbery, after a jury trial, and remanded to custody pending sentencing in that case. After several adjournments, they still awaited sentence in May, 1969, by which time they also had been arrested for the Provident robbery. Saltzman admitted his role in the Provident robbery while Palermo maintained he did not participate in that robbery. Evidently, although there were various negotiations between the Queens prosecutors and Palermo and Saltzman,[4] no agreement was

nonexhaustion of state remedies. Since Saltzman did not exhaust state remedies and, by July, 1974, had been released on parole and had made no claim relating to his parole status, he was not a party in the habeas action. The State ultimately withdrew its nonexhaustion defense as to Palermo and consented to the addition, as a party defendant, of the Warden of Green Haven State Prison, where Palermo was incarcerated when the trial began.

3. Plaintiffs consented to the dismissal against Oswald and Jones. The district court also dismissed the action against all the John Doe and Richard Roe defendants, the anonymous parole commissioners. Since no final order had been entered in 1971, when the action against Mackell and Ludwig was dismissed, the court noted that any right of appeal would accrue when

final judgment was entered after the 1976 proceeding.

4. Palermo testified that there were three "deals" offered before sentence was imposed in the Richmond County robbery. The first offer, made at a meeting attended by O'Connor, Queens Assistant District Attorney Demakos, Jacob Evseroff (Palermo's attorney at that time), William Smith (Saltzman's attorney) and Palermo and Saltzman, was for a ten year sentence in exchange for return of the Queens County jewelry. Palermo's reply was that he knew nothing about that crime. Evseroff confirmed that such a meeting was held. The Richmond Assistant District Attorney then obtained an adjournment of the sentencing scheduled for that day. On the next date set for sentencing, Evseroff communicated a

reached before the Richmond County sentence was imposed on June 27, 1969, at which time Palermo received an indeterminate sentence with a maximum of twenty-five years and Saltzman received an indeterminate term with a fifteen year maximum. On July 6, 1969, Palermo and Saltzman began their terms of incarceration in Sing Sing State Prison. On July 17, 1969, the two inmates were brought from Sing Sing to the Queens House of Detention for discussions about the Provident robbery and the related charges against them pending in Queens County.

At this point, to better assess the district court's findings, we turn to the testimonial evidence adduced at trial. Palermo testified that shortly after his return from Sing Sing, attorney Bobick[5] conveyed an offer, allegedly from Mackell's office, for reducing the Richmond robbery sentence to seven years for Palermo and five years for Saltzman, with parole after one year from the time they arrived in Sing Sing, and a $100,000 reward from the Provident's insurers for return of the jewels. In addition, Palermo and Saltzman were to plead guilty to the Provident robbery and receive suspended sentences or unconditional discharges. Palermo indicated that this arrangement was acceptable to him.

A few days later, Palermo received a visit from Detective O'Connor, acting as liaison between Mackell's office and the inmates, and attorney Evseroff.[6] Evseroff stated that Bobick had misrepresented the situation, since there could be no resentencing in the Richmond case. Also claiming to be the bearer of a deal from the prosecutor's office, Evseroff offered the following terms: no reduction of the Richmond robbery sentence but parole in 18 months (from the time of the original incarceration in February, 1969) due to prosecutorial intercession with the Parole Board; a suspended sentence or unconditional discharge on the Provident robbery charge; dismissal or unconditional discharge after a plea of guilty to a lesser offense for a pending charge in Oneida County (the "Utica offense") and dismissal of the Utica charge against two codefendants; and dismissal of an assault charge pending in Queens. Palermo testified that he specifically asked O'Connor to determine how the district attorney's office planned to handle interaction with the Parole Board and the Oneida County authorities. He received assurances from O'Connor that Ludwig had made the proper contacts. Evseroff confirmed in his testimony that Ludwig told him that the Parole Board would arrange an early parole for Palermo if Ludwig so recommended; according to Evseroff, "early parole" meant parole after one year in Sing Sing. Palermo conferred again with Bobick, who reaffirmed his bargain and told Palermo to check it out with Norman Rein, an attorney with the law firm of Rein, Mound & Cotton, which firm had been retained by the Provident and its insurer. On October 10, 1969, two members of the Rein firm, Arthur Brook and Eugene Leiman, and Detective Caparell, representing the Queens District Attorney's Office, met with Parole Commissioner Jones. While the specifics of that conversation are

---

second offer of a seven year sentence for Palermo and five years for Saltzman in exchange for the jewelry. Again Palermo expressed his lack of knowledge and again sentencing was adjourned. By the time of the third offer, Palermo had been arrested for the Provident robbery and had learned that Saltzman was a participant. Evseroff was no longer his attorney, having been replaced by Edward Bobick. Palermo accepted a deal which would entail a five year sentence for him, three years for Saltzman, a $100,000 reward from the Provident's insurers and no prosecution for the Provident robbery. This deal was not consummated when Queens Assistant District Attorney Gaudelli, who had replaced Demakos at the sentencing, refused to consent to less than a seven year term for Palermo, which Palermo would not accept.

5. Bobick represented both Palermo and Saltzman in the Provident robbery case. The law firm representing the Provident and its insurer had promised Bobick a $25,000 fee if his aid resulted in return of the jewelry.

6. Evseroff had represented Palermo in the Richmond robbery case. Evseroff endeavored to effect a return of the jewelry because of a $50,000 fee from the Provident's insurer if the jewels were returned.

unclear, it appears that, at the least, Commissioner Jones indicated that the Parole Board would consider the request for early parole, although no commitment could be made. On October 24, 1969, at a meeting attended by O'Connor, Rein, and Bobick, Palermo testified that he accepted a deal with the following terms: parole on the Richmond sentence after one year; a $100,000 reward from the insurers; a suspended sentence or unconditional discharge after a plea of guilty to the Provident robbery; dismissal of the assault charge in Queens; disposition of the Utica charge by Palermo's plea of guilty to a misdemeanor, and dismissal as to two co-defendants. Later that afternoon, Bobick, Rein and O'Connor returned to tell Palermo that Mackell would not consent to the $100,000 payoff by the insurer. Palermo said that he then accepted the deal without the reward.

Once released, Palermo was taken to Ludwig's office; he testified that the Chief Assistant then personally confirmed the above described terms. Palermo made several phone calls and took detectives to a parked car where $4,000,000 worth of jewelry was found. After the recovery of the jewelry, Mackell issued a press release describing the "largest recovery of stolen property in the history of law enforcement" as a result of "painstaking negotiations by his office." On April 16, 1970, Palermo entered a guilty plea to the Provident robbery. He also pleaded guilty to a misdemeanor in the Utica case, receiving an unconditional discharge. The Queens assault charge ultimately was dismissed. After one postponement, on June 3, 1970, Palermo appeared before the Parole Board for his minimum period of imprisonment hearing. Mackell had written a letter to Russell Oswald, Chairman of the Parole Board, the pertinent part of which stated:

Solely because of the cooperation of [Palermo], practically all of the property taken in that robbery was recovered. In negotiating the return of this property, my office firmly committed itself to use all means lawfully possible to assure lenient treatment to the offender.

Norman Rein also wrote a letter to the Parole Board which stated in pertinent part:

Without the active assistance of Thomas Palermo, the recovery of this enormous amount of property . . . could not have been effected. On the day of the recovery, Mr. Mackell asserted that he would do everything within his power to bring to the attention of the Board of Parole the help that Palermo had given in effecting this recovery and, since that time, Mr. Mackell has repeated that promise.

\* \* \* \* \* \*

For Palermo's efforts . . . I most earnestly and respectfully urge that the Board grant Palermo the utmost consideration and leniency when he appears before it. I would call to your attention the fact that Palermo has received no money or reward of any kind for his part in the recovery. He has received, however, the promise of Mr. Mackell and myself that we would urge your Board to fix the minimum possible time that Palermo will have to serve in jail.

Prior to this apparent support from Mackell, however, on December 15, 1969, John J. McCarthy of the Bureau of Special Services, whose duties included investigations of serious offenders under the aegis of the division of parole, testified that he received a telephone call from Ludwig about the Palermo case. McCarthy stated that he expressed his opinion to Ludwig that Palermo did not merit consideration of any type by any agency because of his serious criminal record. According to McCarthy, Ludwig expressed agreement with this viewpoint and analogized Palermo to Murf the Surf, a recipient of lenient treatment after the return of stolen property, who then committed a violent crime. McCarthy's memorandum summarizing this conversation was placed in several institutional files and circulated to various Parole Board members. After the hearing, the Parole Board set a six year minimum term of

incarceration before Palermo's case again would receive parole consideration.[7]

Chief Assistant District Attorney Ludwig testified that there was an agreement reached about the Provident robbery case, the terms of which were entrance of a plea to a lesser charge and a recommendation of lenient treatment to be made in open court. Although Ludwig stated that he indicated that in all probability this recommendation would be followed, he did not guarantee the outcome. Insofar as parole was concerned, Ludwig testified that his office promised to use its best efforts to obtain maximum leniency from the Parole Board. District Attorney Mackell stated that no one from his staff was authorized to communicate an affirmative commitment from Justice Farrell to impose a suspended sentence in the Provident case. He acknowledged that he had promised to make a great effort and "career" of getting Palermo utmost lenience from the Parole Board. He noted that the letter he wrote on behalf of Paler-

mo constituted extraordinary intercession on his part, since he took such action only twice a year at most.

Eugene A. Leiman, an attorney with the Rein firm, also actively participated in the plea negotiations. Regarding the negotiations about the Utica charge, Leiman testified that he became increasingly distressed because he kept getting different versions of the same conversations from negotiators from the prosecutor's office. He expressed a similar reaction to discussions about the Provident robbery charge. Finally, he spoke to Ludwig privately about whether there was any commitment for a suspended sentence in the Provident case from Justice Farrell. Ludwig replied that he had spoken to the judge privately and was "dead sure." Leiman then spoke to Assistant District Attorney Demakos who said that, as far as he knew, there was no commitment in hand. Leiman attempted to clarify the situation by drafting a letter to go directly to Mackell.[8] In a memorandum dated March 30,

---

**7.** Similarly Saltzman's minimum term was set at five years. On September 30, 1970, still before imposition of sentence in the Provident case, Palermo moved to withdraw his guilty plea in state court. This motion was denied but the Queens County sentencing judge unconditionally discharged both Palermo and Saltzman at the time of sentence, January 11, 1971.

**8.** This letter, signed by Norman Rein and sent to Mackell on April 3, 1970, reads as follows in pertinent part:

Dear Mr. District Attorney:

Because of the sensitive nature of the contents of this letter, I am—perhaps out of excessive caution—having it delivered "for your eyes only."

\*　\*　\*　\*　\*　\*

You will also remember that, in return, Palermo was assured of and promised certain specific assistance and consideration in connection with particular criminal charges.

The first of these concerns Palermo's conviction and sentence for robbery in Richmond County, as a result of which he was sentenced to an indeterminate term in State Prison not to exceed 25 years. With respect to this, you forthrightly stated several times, to me, to my partner, Arthur N. Brook, and to Palermo's attorney, Edward Bobick, that you would "make it a career" to see that Palermo would serve the minimum possible sentence and that, to that end, you would appear before the State Parole Board when Palermo first "met" the

Board, and make a strong recommendation to that effect in his favor. I restated this to Palermo, the last time on the very day when the recovery was effected. We understand that Palermo is scheduled to appear before the Parole Board when it meets in Sing Sing Prison on April 28–30, 1970, and I therefore assume I can rest easy that this commitment will be fulfilled to the letter.

The second area of concern is the disposition of the still open indictment pending in Queens County against Palermo as a result of the Provident Loan Jamaica Branch robbery. As you know, Palermo was given assurance by your good office that this charge would be "taken care of" if the property in question were returned. Just how this indictment would be "taken care of" was the subject of many conversations between your Chief Assistant, Mr. Frederick J. Ludwig, and my partner, Eugene A. Leiman, an old colleague of Mr. Ludwig in District Attorney Frank Hogan's office. It was our understanding that Palermo's case was before Judge Farrell, that Judge Farrell had advised Mr. Ludwig that, if the District Attorney would so recommend, he would impose a sentence, upon Palermo's plea of guilty, that was either suspended or would be "time served" so that, in no event would Palermo have to serve any more time than that fixed by the Parole Board. Mr. Ludwig advised Mr. Leiman that he had made such a recommendation to Judge Farrell, in an informal "off the record" discussion of the matter with the Judge and that,

1970, Leiman summarized his negotiating relationship with the prosecutors about the Provident plea and sentence as follows:

> The difficult [sic] is that even if I get a commitment by telephone on one day, everybody in the Queens D.A.'s office conveniently forgets it the next. I have gotten to the point where I simply do not believe any oral statements emanating from that office.

After hearing the evidence, the district court concluded that Palermo and Saltzman were induced to plead guilty to the Provident robbery charge by representations made to them by Ludwig and O'Connor that they would receive parole after one year in prison; that Mackell knew of the specific commitments made about parole; that Ludwig and Mackell knew they had no such assurances from the Parole Board; and that Mackell clearly violated his agreement to take all possible steps to achieve an early parole for Palermo and Saltzman. In short, the district court concluded that the plea bargain was negotiated in bad faith by the prosecutors and that it was not carried out.

Appellate review of findings of fact is limited to a determination of whether those findings are "clearly erroneous," giving "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses." Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). Where findings relate to the design, motive and intent behind human actions, they especially depend upon the credibility assessment of witnesses by those who see and hear them. *United States v. Yellow Cab Co.,* 338 U.S. 338, 341, 70 S.Ct. 177, 94 L.Ed. 150 (1949); *Caputo v. Henderson,* 541 F.2d 979, 984 (2d Cir. 1976); *United States ex rel. Wissenfeld v. Wilkins,* 281 F.2d 707, 713 (2d Cir. 1960). Thus, an appellate court, equipped only with a "cold" record, is appropriately reluctant to reject the credibility evaluations of the district court.

The State challenges the district court's findings on the ground that it failed to consider critical facts, primarily the extraordinary role played by Palermo's attorneys Evseroff and Bobick. The State essentially contends that because both men would receive a fee from the Provident's insurer if the jewels were returned, they had a clear motive to make whatever representations would inspire Palermo to return the jewels. In addition, the State argues that the attorneys had a duty independently to verify the parole promise with the Parole Board itself. Finally, the State asserts that "it is clear Palermo was hardly the most credible witness" worthy of total belief by the district court.

therefore, were Palermo to plead guilty, he would have "nothing to worry about".

Recently, however, your Mr. Thomas Demakos who, strictly speaking, has jurisdiction over Palermo's case, has advised us that, so far as he knows, Judge Farrell has indicated no more than that any sentence he may impose on Palermo would run "concurrent" with the Richmond County sentence—which is, of course, a far cry from what we were led to believe would actually happen.

Without being in the slightest sense critical of either Mr. Ludwig or Mr. Demakos—both of whom we hold in the highest esteem—it would seem that there is somewhat of a dichotomy in the matter between them.

You alone can resolve that apparent conflict in your staff and, in line with your previously expressed attitude, can resolve it in favor of urging extreme consideration for Palermo. Palermo's case in your County has been adjourned to April 8, when he will again appear before Judge Farrell. We understand that if the type of sentence that Mr. Ludwig previously recommended is then available, Palermo will make a disposition of his indictment.

I realize that you have many perhaps more important matters that make current demands on your time and attention. Yet, in the circumstances, I sincerely believe that this matter, which involves no more than honoring a commitment to a convicted robber for helping your office recover stolen property belonging to over 2,000 residents of your County is, consonant with the way you have enhanced the dignity and prestige of your office, still worthy of your personal attention and consideration.

■ (We conclude that there was substantial evidence to support the district court's finding of prosecutorial bad faith in negotiations and nonfulfillment of the plea bargain. Whether or not there was a specific guarantee of parole after one year, negotiations for the return of the jewels certainly included achieving minimum incarceration for the Richmond robbery through the intercession of the district attorney's office in parole proceedings; minimum incarceration in this case would have constituted a one year term. The evidence also showed that the prosecutor's office did not use even its best efforts to achieve utmost lenience from the Parole Board for Palermo and Saltzman. John McCarthy's testimony about his conversation with Ludwig, memorialized in a memorandum circulated to several Parole Board members, certainly brings into question the diligence with which the prosecutors intended to fulfill their part of the bargain. Although Mackell did write a letter to the Parole Board, the recommendation of "lenient treatment" in that letter represented only a feeble effort to fulfill Mackell's commitment to make a "career" of achieving utmost lenience, especially when compared to Rein's letter written for the same purpose. Notably, Rein also offered to appear personally before the Board. While the Board does not permit third parties to appear at the hearing itself, special meetings can be scheduled upon request. Commissioner Oswald testified that the District Attorney's office had never requested such a meeting.

There is also the testimony of Eugene Leiman, who participated in the negotiation phase, which reflected his frustration about the firmness of any oral commitment from the district attorney's office. Finally, there are the contradictions, too numerous to mention, between testimony from the prosecutors and related staff and from other witnesses.[9] After consideration of the entire record, we simply cannot fault the credibility assessments made by the district court or conclude that its findings were erroneous, much less clearly erroneous.[10]

II. *Enforcement of the Plea Bargain.*

The State raises three arguments grounded in contract law which dispute the validity of the negotiated agreement. First, the State contends that stolen property cannot serve as consideration for a bargain. The State also asserts that Palermo materially breached the bargain by failing to return all of the jewelry. Finally, the State claims that any parole promise was outside the scope of prosecutorial authority and not binding on the State.

■ Although we noted last term that principles of contract, evolving as they do from the commercial world, are "inapposite to the ends of criminal justice," *United States ex rel. Selikoff v. Com. of Corr.*, 524 F.2d 650, 654 (2d Cir. 1975), this Court has not previously examined the extent to which the contractual defenses would be applied to plea bargaining in the criminal justice system.[11] Guiding our analysis is

9. For example, Ludwig testified that he had not communicated any commitment from Justice Farrell as to sentence in the Provident case. Leiman testified that Ludwig privately had assured him of such a commitment.

10. We fail to see how the conduct of attorneys Evseroff and Bobick helps the State's argument, since it might only raise a further claim of ineffective assistance of counsel. We cannot condone the questionable practice of negotiating plea bargains, thereby advising clients to plead guilty, while at the same time collecting rewards from insurers.

11. In *United States v. Boulier*, 359 F.Supp. 165, *aff'd sub nom. United States v. Nathan*, 476 F.2d 456 (2d Cir.), *cert. denied*, 414 U.S. 823,

94 S.Ct. 171, 38 L.Ed.2d 56 (1973), the district court denied the defendant's motion to dismiss an indictment for two reasons: the defendant had failed to fulfill his part of a plea bargain and the Assistant United States Attorney possessed the authority to bind only his own district in plea agreements. On appeal, this Court affirmed on the first ground and explicitly did not rule on the authority of one United States Attorney to bind another or on the proper remedy for a defendant who has been deceived. 476 F.2d at 459. In *United States ex rel. Selikoff v. Com. of Corr., supra,* we found that no unconditional sentencing promises had been made by the trial judge and that any due process deprivations had been remedied by repleading. Finally, in *United States v. Papa*, 533 F.2d 815, 823 (2d Cir. 1976)

the Supreme Court's recognition of plea bargaining as "an essential component of the administration of justice. Properly administered, it is to be encouraged." *Santobello v. New York,* 404 U.S. 257, 260, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The Court further stated, however, that the plea bargaining process must be "attended by safeguards to insure the defendant what is reasonably due in the circumstances." *Id.* at 262, 92 S.Ct. at 499.

██ The first contractual defense raised is that the return of the jewels is unlawful consideration because Palermo had no legal right to conceal or withhold stolen property. The State analogizes the instant agreement to one made with kidnappers who hold hostages at the time the ransom is negotiated. We believe the facts of this case render the analogy inappropriate and that the State should be estopped from raising this defense at such a late date.

The State claims that the district court's decision sanctifies the return of some of the stolen loot and defies the basic purpose of law. We do not agree. It must be remembered that Palermo claimed that he was innocent of the Provident robbery throughout the bargaining. That bargaining was initiated by the Queens prosecutors when Palermo and Saltzman were in jail for an unrelated crime. Although the parties extensively negotiated what benefits would accrue to Palermo and Saltzman, the prosecutors' objective at all times was effecting the return of the jewels. In addition, it must be remembered that, as part of the bargain, Palermo pleaded guilty to the Provident robbery and the Utica charge. Furthermore, at no time during the negotiations or after Palermo had achieved the return of the goods did the prosecutors express any dissatisfaction with the jewelry serving as consideration for the bargain. Indeed that office widely publicized its success in "painstaking[ly] negotiat[ing]" the return of the stolen property.

The cases cited by appellants to support their argument are inapposite, involving bargains negotiated under extreme duress, *United States v. Gorham,* 173 U.S.App.D.C. 139, 523 F.2d 1088 (1975) (promise of immunity from prosecution given by hostage being mistreated during prison riot), or civil lawsuits for specific performance of a contract solicited by a wrongdoer, *Stamatiou v. United States Gypsum Co.,* 400 F.Supp. 431 (N.D.Ill.1975) (civil suit for specific performance by plaintiff who first committed theft under state law and then proposed bargain with owner for return of property). Thus, whether by notions of fundamental fairness or contract principles of estoppel,[12] we must reject the State's belated and rather disingenuous challenge to the consideration used to support the bargain.

The State's assertion that Palermo materially breached the terms of the bargain by not returning all of the stolen jewelry is equally unpersuasive. We first note that evidently the amount and value of the property stolen was never precisely determined. Moreover, in both its press release and its letter to the Parole Board, the district attorney's office indicated no dissatisfaction with the extent of the recovery.

The State finally argues that, assuming the Queens District Attorney did promise parole to Palermo on the Richmond County sentence, this promise was *ultra vires* and not binding on the State. Acknowledging the general proposition that prosecutors must keep promises, the State nevertheless contends that it can dissociate itself from a promise if the prosecutor lacked the authority to make the commitment in question. We disagree.

*Santobello v. New York, supra,* 404 U.S. at 262, 92 S.Ct. at 499, established that "when a plea rests in any significant degree

and *United States v. Alessi,* 544 F.2d 1139, 1153 (2d Cir. July 7, 1976), our decisions rested upon the terms of the plea bargain involved, which we found did not bar the contested prosecution.

12. The equity doctrine of estoppel prevents disavowal of a contract after one party in good faith relies to his own detriment on the representations of the other. 1 S. Williston on Contracts, §§ 139–140 (3d Ed. 1975 Supp.).

on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled." Resting on principles of fairness in securing such an agreement and the adjudicative element inherent in accepting a plea, *Santobello* focused on an "appropriate recognition of the duties of the prosecutor in relation to promises made" in plea negotiations. *Id.* Neither the inadvertence of the breach nor its possibly harmless effect[13] obviated the need for remand to the state court for appropriate relief.

Clearly, then, *Santobello* requires relief when the prosecutor fails to fulfill promises within his power made in negotiating a plea bargain. *United States v. Brown,* 500 F.2d 375 (4th Cir. 1974); *United States v. Ewing,* 480 F.2d 1141 (5th Cir. 1973). We believe that the reasoning underlying *Santobello* applies no less when the prosecutor makes unfulfillable promises in negotiating a plea. Most importantly, the voluntariness of a plea induced by unfulfillable promises is, of course, open to grave doubt. In *Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), the Supreme Court declared that a guilty plea induced by misrepresentation, including unfulfilled or unfulfillable promises, could not stand. Additionally, fundamental fairness and public confidence in government officials require that prosecutors be held to "meticulous standards of both promise and performance." *Correale v. United States,* 479 F.2d 944, 947 (1st Cir. 1973). Thus, the courts have afforded relief where prosecutors have made specific sentencing promises which were unfulfillable, since sentencing lies totally within the court's discretion, *United States v. I. H.*

*Hammerman II,* 528 F.2d 326 (4th Cir. 1975); *Harris v. Superintendent, Va. State Penitentiary,* 518 F.2d 1173 (4th Cir. 1975); *Correale v. United States, supra,* or where one federal prosecutor promised immunity from federal prosecution outside his own jurisdiction, *United States v. Carter,* 454 F.2d 426 (4th Cir. 1972) *(en banc), cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974).[14] *Geisser v. United States,* 513 F.2d 862 (5th Cir. 1975) involved breach of a Department of Justice plea bargain which entailed, in part, a promise of parole after three years imprisonment. On appeal, the Department argued that the district court usurped the exclusive power of the Parole Board by ordering release. The Court of Appeals, although it remanded the case for a determination of what the Parole Board would do when informed of the bargain,[15] concluded that such a bargain "fits well within the realm of enforceable constitutional rights . . . ." 513 F.2d at 869 n.11. We agree and hold that where a defendant pleads guilty because he reasonably relies on promises by the prosecutors which are in fact unfulfillable, he has a right to have those promises fulfilled.[16]

The district court determined that specific performance of the plea bargain would constitute the only meaningful relief in the context of this case. The court found that if the agreement had been fulfilled, Palermo would have been released from prison in August, 1970, and the five year parole supervision period would have expired in 1975. Since both of these time periods had passed, the court ordered Palermo's unconditional release. The State argues that the proper remedy would have

---

13. The sentencing judge stated that he had not been influenced by the prosecutor's recommendations.

14. *United States v. Long,* 511 F.2d 878 (7th Cir.), *cert. denied,* 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975), considered a different issue. That case involved promises of immunity from federal prosecution made by a state agent. The issue on appeal was whether an agency relationship existed so that the state agent bound the federal authorities.

15. In the instant case the Parole Board knew about the plea bargain before determining the minimum period of incarceration.

16. Appellants cite a multitude of civil contract cases involving an *ultra vires* defense, which cases rest on totally different policy considerations than those which underlie plea bargaining in the criminal justice system.

been remand to the state court for vacatur of the Provident robbery plea.

In *Santobello*, the Supreme Court listed the possible remedies as either specific performance of the agreement or vacatur of the plea, the choice to be a discretionary one guided by the circumstances of each case. 404 U.S. at 263, 92 S.Ct. 495. Where appropriate, the courts have not hesitated to mandate specific performance of the agreement. *Correale v. United States, supra; Harris v. Superintendent, Va. State Penitentiary, supra.* We cannot conclude that the district court erred in determining that specific performance was the proper remedy in this case. Palermo had already been incarcerated for the entire promised prison sentence and parole term. Remand for withdrawal of the guilty plea would indeed have been meaningless, as the court below found.

### III. *Other Claims.*

■ Appellees contest the 1971 dismissal of the damage action against prosecutors Mackell and Ludwig. We find this case to fall within the purview of the Supreme Court's recent decision in *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976) and affirm the dismissal.

■ Finally, we cannot say that the district court abused its discretion in denying attorney's fees and costs to Jones and Oswald. Fed.R.Civ.P. 54(d).

We affirm the decisions of the district court on both the appeal and cross-appeal.

BARTELS, District Judge (dissenting):

I respectfully dissent.

As stated by Chief Judge John R. Brown in *Geisser v. United States*, 513 F.2d 862, 863 (5th Cir. 1975), "[t]his is an extraordinary case calling for extraordinary action." In this habeas corpus proceeding, originally instituted as a 42 U.S.C. § 1983 action, the majority expands the jurisdiction of a district attorney of one county to (i) bind the Board of Parole of the State of New York, (ii) emasculate an indeterminate sentence with a maximum of 25 years previously imposed upon the petitioner, Palermo, by a state court in another county, and (iii) substitute therefor a one year sentence plus a five year period of parole supervision. The predicate for this result is a breach of a promise or commitment made by Queens County district attorney Mackell and his chief assistant Ludwig to carry out that part of a plea bargain promising Palermo early parole on a Richmond County conviction which induced him to plead guilty to a Queens jewelry theft and return $4 million worth of stolen jewelry, over which Palermo obviously had control. It was also provided in the agreement that Palermo would receive a discharge or suspended sentence for the Queens County plea of guilty, a dismissal of an assault charge pending in Queens County, and a disposition of an Oneida County charge which consisted of a plea of guilty by Palermo and a dismissal as against two codefendants. All parts of the agreement were performed except the parole promised Palermo after one year incarceration under the Richmond County sentence.

The facts are set forth in detail in the majority opinion, which in turn is based upon the findings of the district court. From these facts the precise nature of the prosecutor's commitment is unclear as to whether it was a firm or "best efforts" commitment to obtain Palermo's parole. In all events, it is clear that neither the Parole Board nor Parole Commissioner Jones made any commitment to anyone other than to give consideration to a petition for early parole. By releasing Palermo who was serving a sentence of up to 25 years imposed by the Richmond County court, the majority enforces a promise by Mackell for early parole even though it would seem questionable to the ordinary, reasonable man whether such a promise when made was within the power, authority or jurisdiction of the district attorney of Queens County. Indeed, Palermo himself, was suspicious and asked for assurances that the parole promise would be performed.

In this frame of reference, I join in the majority's condemnation of the prosecutori-

al misconduct in making commitments and representations that were knowingly false in that Mackell and Ludwig had no assurance at any time from the Parole Board regarding Palermo's parole. Courts prohibit such prosecutorial misconduct from depriving a defendant of his constitutional rights and accordingly order relief, if possible, in the nature of specific performance of the prosecutor's promise, or in the alternative, the withdrawal of the defendant's guilty plea. *Santobello v. New York*, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971).

### Prosecutorial Promises Involving Other Jurisdictions

In a case of this kind, however, release of a defendant under the guise of specific performance of an unauthorized and in fact, an unfulfillable promise by the district attorney disrupts the state administration of justice and usurps governmental agencies outside of the jurisdiction or authority of the prosecutor. *See United States v. Long*, 511 F.2d 878 (7th Cir.), *cert. denied*, 423 U.S. 895, 96 S.Ct. 196, 46 L.Ed.2d 128 (1975); *United States v. Boulier*, 359 F.Supp. 165 (E.D.N.Y.1972), *aff'd on other grounds sub nom. United States v. Nathan*, 476 F.2d 456 (2d Cir.), *cert. denied*, 414 U.S. 823, 94 S.Ct. 171, 38 L.Ed.2d 56 (1973). In this case it appears that streetwise Palermo, who knew the whereabouts of several million dollars worth of stolen jewelry, assuming that he is not guilty of the theft, was able to extract from the prosecutor an unauthorized promise not binding upon other independent governmental agencies or jurisdictions of the government, and thereby obtain immediate release because those independent authori-

ties failed or refused to perform a promise they never made. The district attorney of Queens County operates within specified geographic jurisdictional boundaries,[1] and consequently he has no justification for proscribing the authority and obligations of the district attorney elected[2] in Richmond County, nor of the New York State Board of Parole which is the sole body charged by law with determining who shall be released among inmates serving indeterminate sentences, and under what conditions.[3] Therefore, it would seem to me that instead of releasing the defendant forthwith as though he had been placed on parole, consideration must be given to fashioning a remedy which is more in harmony with the fundamental structures and principles of state and federal governments.

Here, the alternative of permitting Palermo to withdraw his guilty plea is under the circumstances meaningless, and moreover, under no circumstances could the prosecutor return to the thief or his accessory $4 million worth of jewelry. Therefore, we are faced with the dilemma of being unable to effectuate a form of specific performance of the prosecutor's promise or to place Palermo back in the status quo, which to say the least was tainted with illegality.

Mackell, unlike prosecutors in the usual case whose interest is to obtain testimony for pending prosecutions, was acting under duress to retrieve the stolen jewelry deposited as collateral for loans by thousands of Queens residents. In exchange for his promise to return the jewelry Palermo succeeded in extracting from Mackell *ultra vires* promises. The majority, I believe, dismisses too quickly the reasoning in *Unit-*

---

1. N.Y. County Law § 700(1) (McKinney's 1972); N.Y. Criminal Procedure Law § 20.40 (McKinney's 1971); *People v. Dorsey*, 176 Misc. 932, 29 N.Y.S.2d 637 (Queens Co.Ct. 1941); Nadjari, *New York State's Office of the Special Prosecutor: A Creation Born of Necessity*, 2 Hofstra L.Rev. 97, 112–14 (1974).

2. N.Y. Constitution Art. 13, § 13(a) (McKinney's Supp. 1975–76).

3. N.Y. Correction Law § 210 (McKinney's Supp. 1975–76); *People ex rel. Washington v. LaVallee*, 34 App.Div.2d 603, 308 N.Y.S.2d 628

(3d Dep't), *motion for leave to appeal denied*, 27 N.Y.2d 481, 312 N.Y.S.2d 1025, 260 N.E.2d 874 (1970); *People ex rel. Smith v. Deegan*, 32 App.Div.2d 940, 303 N.Y.S.2d 789 (2d Dep't 1969). In order to parole a prisoner the Board of Parole must be of the opinion that "there is reasonable probability that, if such prisoner is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society." N.Y. Correction Law § 213 (McKinney's Supp. 1975–76).

*ed States v. Gorham*, 173 U.S.App.D.C. 139, 523 F.2d 1088 (1975), in which a prison director held hostage by inmates promised there would be no reprisals or court action against the inmates. The *Gorham* court stated that even if the promise had been made with authority, it was voidable since, among other reasons, it was induced by duress. Palermo's refusal to divulge the identity or location of those who possessed the stolen jewelry violated the law[4] and subjected the prosecutor to a form of duress, rendering the promise unenforceable at least as far as equitable relief is concerned. Therefore, referring to specific performance involving immediate release, he does not stand in the same shoes as those, who, for instance, under a plea bargain agree to cooperate and testify to assist the government in obtaining convictions of other defendants.

It is true that the courts do hold a prosecutor not only to promises which may be fulfilled, but also to some of those which are unfulfillable. But in all such cases the unfulfillable promise was not specifically enforced retroactively against other independent agencies or jurisdictions. The majority relies upon cases which I believe do not support the relief of immediate release. Though *Brady v. United States*, 397 U.S. 742, 755, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), does assert, in dicta, the proposition that an unfulfillable promise by a prosecutor which induces a plea of guilty constitutionally taints that plea, the Court does not purport to distinguish among the several categories of unfulfillable promises nor does it specify the appropriate relief to be granted. *Santobello, supra,* cited as authority for granting immediate release in this case as specific performance, is inapposite since *Santobello* concerned a direct appeal involving a single criminal conviction in one jurisdiction. The *Santobello* Court did not man-

date the relief granted here where the prerogatives and responsibilities of other agencies and public officials are implicated by *ex post facto* interference by a powerless district attorney making unauthorized promises.

Similarly, I do not believe that *United States v. Carter*, 454 F.2d 426 (4th Cir. 1972) *(en banc), cert. denied,* 417 U.S. 933, 94 S.Ct. 2646, 41 L.Ed.2d 237 (1974), is apposite. There, a federal prosecutor in the District of Columbia allegedly promised that no criminal charges would be brought in any jurisdiction concerning a group of stolen checks other than a misdemeanor charge for which the defendant was pleading guilty. Nevertheless, a criminal indictment was later brought in the Eastern District of Virginia, and the court of appeals in that case, by its own decision, determined that it would honor the promise by the prosecutor in the District of Columbia. Here, however, the promise concerned a previous conviction for an unrelated crime and none of the concerned authorities who possessed the power to grant the promised relief ever promised the relief.

### Remedy

The question then is what is the appropriate relief under the circumstances. Other courts in the past have faced similar problems. In *Geisser v. United States, supra,* the federal government entered into a plea bargain with the defendant providing that if she pleaded guilty and provided indispensable evidence against others she would not be confined for more than three years and the government would use its best efforts[5] to prevent her deportation to Switzerland or France following incarceration. She then sought habeas relief since there was an outstanding warrant for her deportation to Switzerland, and the federal Board of Parole failed to honor the govern-

---

4. Palermo was required to disgorge or divulge the whereabouts of the jewelry prior to, and apart from any agreement with the district attorney. N.Y. Personal Property Law § 252 (McKinney's 1976); N.Y. Penal Law §§ 205.-50(1), (4), (5), 205.55 & 205.60 (McKinney's 1975).

5. The court of appeals assumed a best efforts promise, though the district court found an absolute commitment. 513 F.2d at 869, 872.

ment's commitment concerning the three year limit of incarceration. The Department of State and the Board of Parole were not informed of the bargain, and when the petitioner applied for parole the Department of Justice disavowed the agreement and actively opposed parole and the Board of Parole denied the request. On the habeas petition, the district court granted immediate release, and the court of appeals vacated the lower court's decision and remanded, stating at 513 F.2d at 869:

> We recognize that in a structure of independent quasi-adjudicative agencies within an Executive department there is and should be no hierarchical intrusion into the exercise of administrative discretion. At the same time, that agency needs to be advised in positive terms of the agreements made, the consequences of which were (i) rich in terms of the public interest and (ii) of constitutional consequences to the bargainee if not honored.

and again at page 871:

> Sharing as we do the Government's concern about judicial intrusion into the parole process, we defer until after remand whether we would put our stamp of approval on the District Judge's order which in effect releases Bauer at the end of the reconstructed three-year term.

The *Geisser* court ordered resubmission of the parole request to the Board and then provided that if the petitioner was not released on parole the district court "shall conduct further hearings after allowing fullest discovery on all issues and particularly on the question of just what has been done with the promise 'to use our best efforts' and the reasons why, if any, steps have not been taken or why they have been ineffectual." *Id.* at 872.

In *United States v. Carter, supra,* Judge Boreman dissented upon the ground that Carter was not entitled to the relief sought under any theory, reasoning that "the United States Attorney's office for the District of Columbia could not enter into a valid plea bargaining agreement to bind the district court and the federal prosecutor in another jurisdiction with respect to separate and wholly different crimes committed outside the District of Columbia." *Id.* at 431. Among other things, Judge Boreman stated that "[t]he executive officials and courts of the Eastern District of Virginia should not be prevented from seeking to punish crimes victimizing the people of that district because an official elsewhere has overstepped the limits of his power." *Id.* He suggested as a remedy that Carter move for a reduction of sentence in Virginia, or else that he be considered for executive clemency.

For the reasons above indicated I do not believe that our "zeal to right the wrongs of prosecutorial excess," *Martin v. Merola,* 532 F.2d 191, 198 (2d Cir. 1976) (separate statement of Gurfein, *J.*), should induce us to grant, in effect, specific performance of an unauthorized and unfulfillable promise involving the intrusion into the exercise of administrative discretion of a wholly independent agency. For such excesses other remedies such as removal of the prosecutor from office are available. N.Y. Constitution Art. 13, § 13(a) (McKinney's Supp. 1975–76). Since the stolen property cannot be returned to Palermo a form of rescission is impossible. I am not too disturbed by this fact since Palermo had no interest in the property and had an obligation to return it in the first place. While a completely equitable solution may not be possible under the circumstances, I would do the next best thing by permitting Palermo to withdraw his Queens County plea of guilty if he so desires, for whatever it is worth, and at the same time I would construe the promise made of early parole as a "best efforts" promise. I would direct the present Queens County district attorney to make every effort on behalf of Palermo before the Parole Board to obtain such early parole. This result would recognize the sovereignty of the Board and probably grant Palermo a significant chance of immediate release. If the Parole Board fails to take action Palermo's alternative would be to petition for executive clemency.

I would affirm as to the cross-appeal concerning the damage action against Mac-

kell and Ludwig and also affirm the denial of attorney's fees and costs to Jones and Oswald.