Edward H. HARNED, Jr.,
Petitioner-Appellee,

v.

Robert J. HENDERSON, Superintendent,
Auburn Correctional Facility,
Respondent-Appellant.

No. 54, Docket 78–2031.

United States Court of Appeals,
Second Circuit.

Argued Sept. 13, 1978.

Decided Nov. 21, 1978.

Jeffrey Ira Zuckerman, New York City, for petitioner-appellee.

Kevin J. McKay, Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Samuel A. Hirshowitz, First Asst. Atty. Gen., State of

---

New York, New York City, of counsel), for respondent-appellant.

Before OAKES, GURFEIN and MES-KILL, Circuit Judges.

MESKILL, Circuit Judge:

■ The State of New York, on behalf of the Superintendent of New York's Auburn Correctional Facility, appeals from an order and judgment entered in the United States District Court for the Eastern District of New York, Edward R. Neaher, *Judge,* granting to Edward H. Harned, Jr., a petition for a writ of habeas corpus, releasing him from state custody [1] and vacating his conviction. The central issue on this appeal is whether Harned's plea of guilty, upon which his conviction was based, was voluntary in a constitutional sense. For the reasons that follow, we cannot hold that it was and, accordingly, we affirm the decision of the district court.

This case is before us after having travelled an unusually tangled path. In November of 1969 the Nassau County Police Department arrested Harned on a complaint of rape and sodomy. After arraignment he was released on $2,500 bail. On December 2, 1969, a felony hearing was held in the District Court of Nassau County before Judge Lyman D. Hall, and on January 20, 1970, the Nassau County Grand Jury returned an indictment charging Harned with rape in the first degree, sodomy in the first degree, sexual abuse in the first degree and assault in the second degree. Harned denied the charges then and continues to deny them today. He remained free until January of 1971 when he was again arrested—again for rape but this time for burglary as well. Harned waived a felony hearing and, on March 9, 1971, the Grand Jury returned an indictment charging him with rape in the first degree, burglary in the first degree and possession of burglars' tools. He was arraigned on April 12, 1971, before Nassau County Court Judge Harold M. Spitzer and pleaded not guilty.[2] The two indictments are, for most purposes, unrelated. It is the second indictment that is at the center of this appeal.

On June 23, 1971, Harned appeared before Nassau County Court Judge Frank X. Altimari and in satisfaction of all charges in both indictments pleaded guilty to the second indictment's charge of burglary in the first degree.[3] Present at the hearing

---

1. Harned was released on parole after having served five years of his ten-year sentence. Parole is "custody" for purposes of federal habeas corpus. *Jones v. Cunningham,* 371 U.S. 236, 243, 83 S.Ct. 373, 9 L.Ed.2d 285 (1963).

2. The record on appeal contained neither a copy of the second indictment nor a copy of the minutes of Harned's arraignment under that indictment. Similarly, Judge Neaher does not seem to have had the opportunity to consider these key documents. In order to evaluate this appeal thoroughly, we ordered their production. The Supreme Court has made it clear that "[a] District Court sitting in habeas corpus clearly has the power to compel production of the complete state-court record." *Townsend v. Sain,* 372 U.S. 293, 319, 83 S.Ct. 745, 760, 9 L.Ed.2d 770 (1963). When decisions by district courts are appealed from, we have the obligation to exercise that same authority. *See also* 28 U.S.C. § 2254(f).

3. As will become apparent, the statutory definition of burglary in the first degree is critical to the disposition of this appeal. The offense is classified as a Class B felony, punishment for which is up to 25 years in prison. N.Y.Penal Law § 70.00(2)(b). The offense is, in relevant part, defined as follows:

A person is guilty of burglary in the first degree when he knowingly enters or remains unlawfully in a dwelling at night with intent to commit a crime therein, and when, in effecting entry or while in the dwelling or in immediate flight therefrom, he or another participant in the crime:

. . . . .

2. Causes physical injury to any person who is not a participant in the crime

. . . .

N.Y.Penal Law § 140.30. In relevant part, the indictment reads as follows:

SECOND COUNT

AND THE GRAND JURY AFORESAID by this indictment further accuse the defendant of the crime of BURGLARY IN THE FIRST DEGREE, committed as follows:

The defendant, EDWARD H. HARNED, on or about the 16th day of January, 1971, in the County and State aforesaid, in the nighttime of said day, knowingly entered and remained unlawfully in the dwelling house of _____, located at _____, with intent to commit the crime of rape therein, and in effecting entry

were Harned's parents and his two attorneys, Richard Schulz and Joseph McCartney. During the course of this hearing the following exchanges took place:

The Court: On the 16th day of January, 1971, in the night time, did you enter and remain unlawfully in the dwelling house of a person by the name of _____, located at _____, with intent to commit a crime therein?

The Defendant: Yes, sir.

The Court: It is alleged here that the crime that you intended to commit was rape. You understand that?

The Defendant: Yes, sir.

The Court: Was there an attempt to commit the rape?

The Defendant: It was an intent.

The Court: That's all I want to know, was there an intent to commit the crime of rape and was it at night time? Let's start from the beginning. Did you enter the house by reason of license or invitation?

The Defendant: The answer to the last question is yes.

The Court: All right. So you went to the house unlawfully; is that correct?

The Defendant: Yes, sir.

The Court: You had no invitation?

The Defendant: Yes, sir.

The Court: It was night time?

The Defendant: Yes, sir.

The Court: Did you know these people at all?

The Defendant: No, sir.

The Court: So you went into a strange house at night. Did you break through?

The Defendant: Yes, sir.

The Court: How did you break in?

The Defendant: Through a window.

The Court: So you were in that house for the purpose of committing a crime; is that correct?

The Defendant: Yes, sir.

and while in the said dwelling house and in the immediate flight therefrom, caused physi-

The Court: All right, the plea is accepted. And this was on the 16th day of January, 1971?

The Defendant: Yes, sir.

The Court: The plea is accepted.

. . . . .

The Court: All right. Do you understand that the plea that was offered by you was to burglary in the first degree in satisfaction of that [second] indictment and the indictment charging you with rape in the first degree, sodomy in the first degree, sexual abuse in the first degree and assault in the second degree; you understand that?

The Defendant: Yes, I do.

. . . . .

The Court: Is there any question in your mind that you are guilty of the burglary?

The Defendant: Of the burglary, no.

The Court: All right. I understand your position. Your position is clearly that you are guilty of burglary in the first degree, but you don't feel guilty with regard to the other.

The Defendant: I know I am not guilty.

The Court: All right, your position is you are not guilty with regard to the rape in the first degree.

. . . . .

I am not asking you to admit to the rape in the first degree. What I am saying to you is, as long as this Court is satisfied that you know that you are in fact guilty of burglary in the first degree and I am satisfied because the rape charge is being included to the extent that it is now in satisfaction of, do you understand that?

The Defendant: This one charge I am pleading to covers all charges?

The Court: Right. It is not an admission of the rape.

cal injury to _____, who is not a participant in the crime.

The Defendant: What do I say to people when they ask me why I didn't take it to trial if I know I am innocent?

The Court: Then take it to trial.

The Defendant: I would be so prejudiced.

The Court: I am not here to convince you that you should or should not take this plea. I think your position is clear. You say you never did what is charged in that [first] indictment.

The Defendant: I never did it, no.

The Court: You are not admitting to that indictment. I did not ask you to admit because I took the position that you took in the beginning. You say you are innocent. My question to you is, are you guilty of the burglary?

The Defendant: Yes, I am guilty of the burglary.

The Court: And at the time you committed the burglary, you entered this house at night time for the purpose of committing a rape; isn't that true? The fact that you didn't consummate the rape is of no consequence. I want to know whether or not you committed a burglary.

The Defendant: Yes.

The Court: All right, I think the record is clear.

That same afternoon Harned began writing a letter to Judge Altimari asking that he be allowed to withdraw his plea; once written, the letter was dated June 30, 1971. In the letter Harned insisted that he was innocent of the crimes charged in the first indictment and that he had pleaded guilty only as the result of varied and intense pressures—the fear that the second indictment would be tried before the first,[4] parent pressure, attorney pressure, financial pressure, fear of long incarceration and so on.

On October 1, 1971, a hearing was held before Judge Altimari, the scheduled purpose of which was to sentence Harned pursuant to the plea of guilty. The sentencing was adjourned, however, because of the request for permission to withdraw the plea. At this hearing Harned's attorney made the following observation:

[T]here is some serious doubts in his mind, and no lawyer, including myself, and no other person, has been able to convince him that he is guilty of burglary. He claims he didn't understand the elements of burglary, he didn't know what he was talking about. That's his position, Judge.

Judge Altimari held a hearing on October 29, 1971, to determine whether Harned understood "the nature of the proceedings" of June 23, 1971. At the hearing Harned's mother testified that she had told Harned at the time of the plea that she and her husband had just paid the attorneys $5,000 for their efforts and could afford no more. She also testified that Harned's father had been terminally ill with cancer and that he had died shortly thereafter. Harned testified that when he told his parents he was not going to plead guilty his father became outraged and his mother began crying. He also said that, although he had understood that a plea of guilty would lead to 15 years incarceration, he had not understood the elements of first degree burglary or the "legal implications involved" in his answers at the previous hearing.

On December 23, 1971, Judge Altimari issued a memorandum of decision in which he concluded that Harned had understood the June 23, 1971, "proceedings"; he declined to allow Harned to withdraw the bargained plea. As part of his findings of fact, Judge Altimari observed that "[Harned] . . . admitted that he knowingly entered and remained unlawfully at the burglarized home in the night time and had the intent to commit the crime of rape." With regard to the attempt/intent

---

4. Harned apparently believed that his defense to the first indictment was considerably stronger than his defense to the second indictment, and that if he were tried on the second indictment before he was tried on the first indictment he would have little if any chance of avoiding conviction on even the first indictment.

portion of the June 23 hearing,[5] Judge Altimari concluded that "[Harned] quickly stated that he *intended* to commit the crime of rape and thereby inferentially denied an *attempt* to rape." (Emphasis in original). As to the question whether he had explained to Harned that the charge of burglary in the first degree included a charge of physical injury, Judge Altimari made the following finding:

> In the case at bar, the defendant did not want to admit a forcible rape out of fear of the stigma which might attach. Thus, this court did not inquire during the Change of Plea proceeding whether the victim was physically injured during the commission of the crime of Burglary in the First Degree. The court, instead, immediately shifted its inquiry and continued as recommended in the *Serrano* case. [*People v. Serrano*, 15 N.Y.2d 304, 258 N.Y.S.2d 386, 206 N.E.2d 330 (1965)].
>
> Such *"Serrano"* type plea of guilty has been held valid. In *North Carolina v. Alford*, (400 U.S. 25 [91 S.Ct. 160, 27 L.Ed.2d 162]) the Court held that an express admission of guilt was not a constitutional requisite to the imposition of sentence after a guilty plea, and a court may accept a guilty plea although a defendant does not admit guilt, but where strong evidence of guilt exists. Here, the defendant admitted all elements of the crime of Burglary in the First Degree except that of physical injury. The lack of inquiry with respect to physical injury was necessary in view of the position the defendant took and the defendant's desire to avoid the risk of a more severe penalty.

On January 19, 1972, Harned was sentenced to a maximum of ten years in prison.

In a letter dated December 12, 1972, and addressed to the attorney appointed by the New York court system to assist Harned in an appeal from his conviction, Harned offered the following as support for reversal:

On June 23, 1971, I had no idea what Burglary meant as defined by the Penal Code, much less Burglary in the First Degree. Remain unlawfully, at night, dwelling, intent, armed or assault, were not terms with which I was familiar. I have said that I had an invitation, denied intent, and never admitted assault.

Nevertheless, Harned's conviction was affirmed, *People v. Harned*, 40 A.D.2d 952, 337 N.Y.S.2d 995 (2d Dep't 1972), and on January 29, 1973, Associate Judge Sol Wachtler denied leave to appeal to the New York State Court of Appeals.

It was at this point that the federal courts became involved. On June 23, 1973, precisely two years after he had pleaded guilty in front of Judge Altimari, Harned filed a *pro se* petition for a writ of habeas corpus in the United States District Court for the Eastern District of New York, Orrin G. Judd, *Judge*. In the petition Harned alleged both speedy trial and due process violations. Still another year later, on June 26, 1974, Judge Judd dismissed the petition for failure to exhaust state remedies, but did so without prejudice to renewal of the petition after further state court proceedings. Judge Judd reasoned that the state courts should have the first opportunity to consider two important questions—whether the proceedings on the guilty plea showed facts sufficient for burglary in the first degree and whether Harned's attorneys had refused to defend him at trial even though they had received a substantial fee. The state court denied without a hearing Harned's motion to vacate his conviction on November 14, 1974, and his application for leave to appeal to the Appellate Division was denied on January 28, 1975. Harned renewed his federal petition on March 5, 1975, this time represented by counsel appointed by Judge Judd.

On October 16, 1975, Judge Judd denied Harned's petition. As to Harned's claim that his attorneys had "abandoned" him in

---

**5.** The Court: It is alleged here that the crime that you intended to commit was rape. You understand that?

 The Defendant: Yes, sir.

 The Court: Was there an attempt to commit the rape?

 The Defendant: It was an intent.

the state proceedings, Judge Judd held that Harned had waived the argument by not raising it in the state court, citing *Fay v. Noia*, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). With regard to the guilty plea, however, Judge Judd found the following:

The transcript of the petitioner's entry of his plea of guilty to burglary in the first degree establishes clearly that the element of physical injury required for that degree of crime was not admitted.

In light of the close similarities between burglary in the first and second degrees . . . proof of the necessary elements was not established by petitioner's admission in open court, on several occasions, that he was guilty of "burglary."

Technically, the record is deficient in showing that defendant was in fact guilty of burglary in the first degree.

Nevertheless, he concluded that "[t]he failure to establish the element of physical injury is harmless error under the circumstances of this case" and denied the petition. Harned appealed Judge Judd's decision to this Court. On June 29, 1976, we vacated and remanded for reconsideration in light of the Supreme Court's decision in *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). *Harned v. Henderson*, 535 F.2d 1399 (2d Cir. 1976) (per curiam). Judge Judd died soon after, and the case was assigned to Judge Neaher.

Judge Neaher held hearings on the matter on two separate days in the latter part of 1977—August 5 and November 2. The most important witnesses were Harned's two attorneys from the days of the two indictments and the guilty plea (Schulz and McCartney) and, of course, Harned himself.

Schulz said that Harned's father contacted him on the day of Harned's arrest and asked him to call the Mineola stationhouse, where Harned was being held. When contact was made, Schulz testified, "[Harned] said he was charged with rape and breaking and entering. That was his understanding of the crime." Schulz also offered the following testimony:

Question: Did you, at that time, did your client at that time, had he read the indictment; to your knowledge?

Answer: My client had read the indictment several times. I read it to him several times and Mr. McCartney read to him several times. We were constantly analyzing the details of the indictment.

Question: And did the indictment—let me make sure; did not indictment specify that a rape had occurred?

Answer: Yes, the indictment did.

.    .    .    .    .

The Court: What did you tell him about the law with respect to burglary in the first degree?

The Witness: I can't tell you exactly what was said by him and me, but in general, in discussing the indictment, we selected that particular count because we were trying to avoid the stigma of the rape. We wanted to get away from that if we could.

We selected burglary and we discussed the elements of burglary carefully and read them to him, and he read them himself. The rape was discussed only insofar as there was an injury, because in the way the matter occurred was the holding of a hand over the mouth and a rape, several rapes, and there was no doubt that there was an injury in the course of this matter.

.    .    .    .    .

The Court: You say those you explained to him, the element of first degree burglary.

Do you recall, particularly, what you might have said?

The Witness: No. I honestly, I don't think I took the count in the indictment and explained it element by element. I think we discussed it generally, that is an overall picture. There was a rape involved in the matter, and we read the count of burglary which includes physical injury, and I don't recall that I said to him that physical injury to a person, not a participant in the crime, is a necessary element in first degree burglary. I don't think I said that to him.

.    .    .    .    .

Question: Do you know whether Mr. Harned was aware of, do you know whether Mr. Harned, on his own, ever read from the Penal Law, the definition of the crime?

Answer: I wouldn't know.

.    .    .    .    .

The Court: I believe . . . Counsel [said] that he didn't think that he particularly isolated physical in explaining the elements of burglary in the first degree; you didn't say that.

The Witness: You are correct, your Honor, right.

Question: Did Mr. Harned ever say, through any statement given to you, that he was aware of the fact that the physical injury was an element of the crime which he was pleading to?

Answer: Mr. Harned read the indictment several times and it was clearly stated in the indictment.

Attorney McCartney testified as follows:

Answer: Well, during the period of January through June of 1971, I visited with Mr. Harned in jail and in the Court in the detention area of the Court, I would say in all, probably about 20 times, and during those 20 times, we discussed the arrest, the alleged crime, the elements of the counts of the indictment; there are three counts.[6]

.    .    .    .    .

[W]e discussed the elements of burglary specifically, and we read it together, we read it separately, I read it out loud and we went into the factual allegations in the second count of the indictment; it was burglary in the first degree, Class B Felony under the Penal Code of the State of New York, that alleged, in substance, that there was an unlawful entry into a dwelling at nighttime in . . . Nassau County by Mr. Harned, with the in-

tent to commit a crime therein, that is, rape. And in the commission of the said rape, the complainant, female, 16-year female, was injured.

Question: Was Mr. Harned made aware that a physical injury was an element of burglary in the first degree?

Mr. Zuckerman [Harned's attorney]: Objection, your Honor, as to the general, made aware.

Question: Did you make him aware, I will rephrase it.

Answer: Did I make him aware, no he made me aware of it when I discussed it with him.

Question: Could you elaborate for the Court how he made you aware of it, didn't you discuss it with him?

Answer: Well, we discussed that particular, those facts of that matter on many occasions and he apprised me of what had occurred on the night in question.

.    .    .    .    .

Question: To your knowledge, did Mr. Harned also read the count of the indictment?

Answer: Read the indictment himself?

.    .    .    .    .

The Court: Did he read the indictment; can you say?

The Witness: I think I alluded to it already, about his reading it, Judge.

The Court: The fact, he did read it?

The Witness: Yes.

.    .    .    .    .

The Court: [W]hat did you tell Mr. Harned about the element of burglary in the first degree?

The Witness: I told him that the thrust of the charge, the graviment [sic] of the charge was that there was an

---

**6.** The log of attorneys' visits to the Nassau County jail shows that Schulz did not visit the jail after the second indictment was returned. From what the record shows, the only contact between Schulz and Harned between the time of the indictment and the time of the plea was on June 17 at the Nassau County Court and then again on the day of the plea. The log of attorneys' visits shows that McCartney visited with Harned at the jail six times between the time of the indictment and the time of the guilty plea; McCartney also visited with Harned at the courthouse.

unlawful entry into a private dwelling at nighttime and I read it verbatim, and then we discussed it for the purposes of committing, with the intent of committing a crime within the dwelling and that the crime alleged was rape, and that in the commission of it, there was an injury to the young female.

.    .    .    .    .

Question: Mr. McCartney, you testified a little about what you say you told Mr. Harned about the first degree burglary, that's all very clear in your mind; you recall the discussions?

Answer: No, it's not that clear. It was, you know, six years ago, over six-and-a-half years ago.

Question: So that actually, this isn't a clear recollection that you have of telling Mr. Harned—

Answer: It's reasonably clear, I would say.

Question: In the last six-and-a-half years, about how many clients have you represented?

Answer: I would say hundreds.

Question: Thousands?

Answer: No, unfortunately not.

Question: With all these hundreds of intervening clients, six-and-a-half years, you can remember your discussion with Mr. Harned?

Answer: Yes.

Harned's testimony was at all times unequivocal. Although he acknowledged that he understood what the charges were against him—rape, burglary and possession of burglars' tools—he repeatedly denied that his attorneys explained to him the nature of first degree burglary,[7] that they had read the indictment to him, that he had read the indictment, that he had been given a copy of the indictment,[8] that he had read the Penal Code definition of first degree

burglary and that the term "physical injury" had ever been mentioned, let alone explained, as an element of first degree burglary. In short, Harned denied that he understood the elements of first degree burglary and that those elements had been explained to him by anyone at any time. When asked what he understood at the time of his arrest to be the nature of the charges against him, he responded, "I believe it was a breaking and entering or something like that or robbery, that was all." When asked about his understanding of the second indictment, he responded, "I knew there was a burglary and I believe there was a rape." When asked what his understanding of first degree burglary was, he said, "It was another word for breaking and entering." As to his understanding of the charge at the time of the plea, Harned testified that he thought "it was just a carry along charge." Toward the close of the hearing, the following colloquy took place:

The Court: Now, so that we will be absolutely clear on this, is it your testimony that prior to the time you finally entered a plea of guilty on June 23rd 1971, you had never seen a copy of the indictment to which you would have pleaded?

The Witness: Yes, Sir.

The Court: It had never been read to you by either of the attorneys who represented you?

The Witness: They never read the indictment. They told me what the charges were.

The Court: They told you what the charges were, what is your best recollection of what they said?

The Witness: Just read it off. They told me it was rape in the first degree, burglary in the first degree, possession of burglar tools.

---

7. Harned did say that he asked McCartney about the possession of burglars' tools charge, and that McCartney explained to him that the "burglars' tools" alleged in the indictment were a putty knife and a can opener, apparently devices commonly used for breaking and entering.

8. Harned testified that he finally did receive a copy of the indictment in March of 1973, having asked for such a copy from the attorney who was representing him at the time.

The Court: When you say they read it off, are you telling the Court that it was not read to you in full?

The Witness: Yes, that is what I am telling you.

The Court: Then it was not read in full?

The Witness: It was not read in full.

. . . . .

The Witness: With all due respect, your Honor, the actual elements of the word burglary were never discussed. My idea it was just a carry along charge and it was a very very low on that second small rung, that smaller ladder [the second indictment]. And my primary concern all along was the first indictment.

. . . . .

I had my idea of what burglary was. It was purely breaking and entering and I was satisfied with that interpretation. But I never asked him anything. He never volunteered. As I said, it was a very very low priority. The word burglary came up.

On February 21, 1978, Judge Neaher handed down his memorandum of decision, in which he concluded:

After conducting an evidentiary hearing and considering briefs submitted by the parties, the court is of the firm impression that petitioner did not understand, and was not so advised by his counsel, that in pleading guilty to burglary in the first degree he was admitting the commission of a crime of violence in which the causation of physical injury was an essential element, N.Y.Penal Law § 140.-30(2). Indeed, it would appear that this aspect of the crime was not disclosed to him precisely because it was believed he would refuse to admit guilt.

Judge Neaher found that the "ambivalence" of Schulz's testimony "preclude[d] any reliable finding that Schulz advised [Harned] of the elements of the crime to which he pleaded." As to McCartney's testimony, Judge Neaher found a "lack of certainty as to who said what to whom." He concluded:

[T]he court is unable to find with any certainty that they informed him, or that he understood he was admitting the actual infliction of, physical injury when he pleaded guilty—in short, that he had "real notice of the true nature of" burglary in the first degree. . . . Such an admission would have been tantamount to acknowledging at least an attempted, if not an actual rape—a crime which petitioner steadfastly refused to admit

. . . .

. . . . .

Cognizant of petitioner's obvious self-interest in the outcome of this proceeding, the court finds that the record as a whole corroborates his testimony that at the time of his plea on June 23, 1971 he did not understand burglary to mean anything more than breaking and entering with intent to commit a rape.

It is from this decision that the State of New York appeals, and it is to the evaluation of that decision that we now turn.

## DISCUSSION

This case is governed in substantial part by the Supreme Court case of *Henderson v. Morgan*, 426 U.S. 637, 96 S.Ct. 2253, 49 L.Ed.2d 108 (1976). There petitioner Morgan had been indicted in New York State for first-degree murder but, after plea-bargaining, pleaded guilty to second-degree murder. Morgan then sought a writ of habeas corpus in federal court, arguing that his plea had been involuntary because he had been unaware of the fact that intent to cause death was an element of second-degree murder. The Court affirmed the grant of the writ, finding that Morgan had received inadequate notice of the offense to which he pleaded guilty, that his plea was therefore involuntary and that, as a result, the judgment of conviction had been entered without due process of law and had to be set aside.

The factual setting in *Morgan* was concededly unique. Morgan had at one time been committed to the Rome State School for Mental Defectives and classified as "retarded"; the Court described him as "sub-

stantially below average intelligence." 426 U.S. at 642, 96 S.Ct. at 2256. No one doubted that he was represented by competent attorneys. The indictment, which charged him with "willfully" stabbing his victim, had been read to him in open court. The indictment did not charge second-degree murder—the crime to which he eventually pleaded guilty. The lawyers did not explain the elements of second-degree murder to Morgan. At the hearing for entry of the plea, there was no discussion of the elements of second-degree murder, nor was there an indication that the nature of the crime had been discussed with Morgan, nor was there reference to the matter of intent.

The Court held that, even when there exists "overwhelming" evidence of a defendant's guilt, a guilty plea "cannot support a judgment of guilt unless it was voluntary in a constitutional sense.[9] And clearly the plea could not be voluntary in the sense that it constituted an intelligent admission that he committed the offense unless the defendant received 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" 426 U.S. at 644–45, 96 S.Ct. at 2257, quoting Smith v. O'Grady, 312 U.S. 329, 334, 61 S.Ct. 572, 85 L.Ed. 859 (1941). See also Brady v. United States, 397 U.S. 742, 748–49 n.6, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970); McCarthy v. United States, 394 U.S. 459, 466, 89 S.Ct. 1166, 1171, 22 L.Ed.2d 418 (1969) ("because a guilty plea is an admission of all the elements of a formal criminal charge, it cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts"). The Court went on to conclude that, because Morgan did not in any way admit to having an intent to kill, and because neither the court nor the attorneys had explained to Morgan that intent to kill was an element of the crime to which he was pleading guilty and that such a plea would be an admission of such intent, it was not possible to conclude that Morgan's plea to the "unexplained charge" of second-degree murder was voluntary in the constitutional sense.[10]

Of particular importance to this appeal is the following observation by the Morgan Court:

> But it is our judgment that physical injury, i. e., violence, is a "critical element" of the offense. And we cannot conclude that, even under the totality of the circumstances, this substance or critical element had been conveyed to Harned. We note as well that, at least on occasion, a "ritualistic litany of the formal legal elements of an offense" is a comparatively simple task and one that may provide useful record evidence on the question whether the defendant at least heard the elements of a charge. See Henderson v. Morgan, supra, 426 U.S. at 649–50 n.2, 96 S.Ct. 2253, 2260 (White, J., concurring) ("In those cases in which the indictment is read to the defendant by the court at arraignment or at the time of his plea, his plea of guilty may well be deemed a factual admission that he did what he is charged with doing so that a judgment of conviction may validly be entered against him."). Cf. United States v. Journet, 544 F.2d 633 (2d Cir. 1976) (Fed.R.Crim.P. 11). Finally, we note that the New York legislature has apparently found wisdom in this approach, and has changed the required practices relating to indictments and subsequent arraignments. Compare N.Y.Code of Cr.Proc. §§ 275, 276, 284, 309 (McKinney) (effective until September 1, 1971) with N.Y.Crim.Proc.Law §§ 200.50, 210.15 (McKinney).

**9.** The Court explained that a plea may be involuntary either because the accused does not understand the nature of the constitutional protections being waived or because the accused has such an incomplete understanding of the charge that the plea cannot stand as an intelligent admission of guilt. 426 U.S. at 645 n.13, 96 S.Ct. at 2257.

**10.** The Court explained that it agreed with the "thrust" of the argument by the State that the voluntariness of a plea should not be tested by determining whether a "ritualistic litany of the formal legal elements of an offense was read to the defendant" but instead by determining whether under the "totality of the circumstances" the "substance of the charge" was "conveyed" to the accused. 426 U.S. at 644, 96 S.Ct. at 2257. See also id. at 647 n.18, 96 S.Ct. at 2258:

> There is no need in this case to decide whether notice of the true nature, or substance, of a charge always requires a description of every element of the offense; we assume it does not. Nevertheless, intent is such a critical element of the offense of second-degree murder that notice of that element is required.

The State makes a similar argument on this appeal and, similarly, we cannot say that we disagree with the thrust of the State's position.

Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit. This case is unique because the trial judge found as a fact that the element of intent was not explained to [Morgan].

426 U.S. at 647, 96 S.Ct. at 2258. It is conceded here that Judge Altimari did not explain to Harned the "physical injury" element of the charge of first degree burglary prior to accepting the plea; he deliberately avoided the topic. The district judge found as a fact that the element of physical injury had not been explained to Harned by his lawyers and had not been understood by him. But here there was "a representation by defense counsel that the nature of the offense had been explained to the accused," a representation contradicted by Harned.

■ It is, of course, well settled that in federal habeas corpus proceedings the burden of proving a constitutional claim lies with the petitioner and that the nature of that burden is the customary civil one of a preponderance of the evidence.[11] *Walker v. Johnston*, 312 U.S. 275, 286, 61 S.Ct. 574, 85 L.Ed. 830 (1941); *Johnson v. Zerbst*, 304 U.S. 458, 469, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *Wolfrath v. LaVallee*, 576 F.2d 965, 971 (2d Cir. 1978); *LiPuma v. Commissioner*, 560 F.2d 84, 92 (2d Cir.), *cert. denied*, 434 U.S. 861, 98 S.Ct. 189, 54 L.Ed.2d 135 (1977); *Klein v. Smith*, 559 F.2d 189, 200 (2d Cir.), *cert. denied*, 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977); *United States ex rel. Curtis v. Zelker*, 466 F.2d 1092, 1097–98 (2d Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1405, 35 L.Ed.2d 612 (1973); *United States ex rel. Fitzgerald v. LaVallee*, 461 F.2d 601, 604 (2d Cir.), *cert. denied*, 409 U.S. 885, 93 S.Ct. 121, 34 L.Ed.2d 142 (1972); *United States ex rel. Brennan v. Fay*, 353 F.2d 56, 58–59 (2d Cir. 1965); 28 U.S.C. § 2254(d). Here, Harned was faced with

---

**11.** Judge Neaher's memorandum of decision contains some ambiguous phrasing in this regard. He expressed what he *did* find in the following fashion:

> After conducting an evidentiary hearing and considering briefs submitted by the parties, the court is of the *firm impression* that [Harned] did not understand, and was not so advised by his counsel, that in pleading guilty to burglary in the first degree he was admitting the commission of a crime of violence in which the causation of physical injury was an essential element . . . . (emphasis added).

> . . . . .

> [T]he court finds that *the record as a whole corroborates [Harned's] testimony* that at the time of his plea on June 23, 1971 he did not understand burglary to mean anything more than breaking and entering with intent to commit a rape. (emphasis added).

> . . . . .

> There can be *little doubt* that [Harned's] plea was . . . without understanding of the true nature of the crime. (emphasis added).

> . . . . .

> [Harned] knew the meaning of rape but understood burglary to be merely "another word for breaking and entering."

In explaining that the State had failed either to match or overcome the evidence put forth by Harned, Judge Neaher used the following language to describe what he *did not* find:

> [T]he court is unable to find with any certainty that [attorneys Schulz and McCartney] informed [Harned], or that [Harned] was admitting the actual infliction of, physical injury when he pleaded guilty—in short, that he had "real notice of the true nature of" burglary in the first degree.

Despite this "any certainty" phrasing, we are confident that Judge Neaher considered the evidence in light of the correct legal standard. In Judge Neaher's judgment, Harned came forth with evidence showing that he did not understand the nature of the crime to which he pleaded guilty and also showing that neither the court nor the attorneys explained to him the important elements of that crime. Also in Judge Neaher's judgment, the State failed to challenge Harned's evidence with sufficient credible evidence of its own. *See United States ex rel. Brennan v. Fay*, 353 F.2d 56, 59 (2d Cir. 1965) ("the quantum of proof which a petitioner must put in his pan in order to make it preponderate necessarily depends on what the state has put in its").

the relatively difficult task of proving a negative—it was his responsibility to show that he did not understand the elements of the crime to which he pleaded guilty and that neither the court nor the attorneys had explained those elements to him. He was necessarily limited to his assertions, to be evaluated in light of the assertions of the other key individuals involved in the case, and these assertions are necessarily evaluated in light of the transcripts and documents that comprise the record of events behind the plea.

The record on this appeal either supports Harned or fails to prove him wrong. The indictment does indeed refer to physical injury as an element of the crime of first degree burglary,[12] but the transcript of the arraignment shows that the judge referred only to the "charges"—he did not read to Harned the text of the indictment. Similarly, the transcript of the hearing at which Harned pleaded guilty shows that he admitted only to intending to rape the resident of the house which he burglarized—there was no admission of violence. In fact, as Judge Altimari found, Harned's insistence on the term "intent" was, at least by inference, a denial by Harned that he even attempted a rape. Thus, the only evidence that Harned even read the indictment, let alone understood the nature of the charge to which he was pleading guilty, is found in the testimony of Harned's attorneys before Judge Neaher.

Judge Neaher made a factual determination "that [Harned] did not understand, and was not so advised by his counsel, that in pleading guilty to burglary in the first degree he was admitting the commission of a crime of violence in which the causation of physical injury was an essential element . . . ." Just as with all findings of fact in civil proceedings, we as an appellate court may not set this finding aside unless we determine that it is "clearly erroneous,"

with "due regard" being given to the trial judge's opportunity to evaluate the credibility of the witnesses. Fed.R.Civ.P. 52(a). The Supreme Court has explained that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). We have no such "definite and firm conviction" here.

As his decision indicates, Judge Neaher believed Harned, whose testimony was at all times firm; he did not believe Harned's attorneys, whose testimony was equivocal. Judge Neaher found support for this determination in the record as a whole, noting particularly that Harned persistently and from the very day of his plea of guilty wanted to avoid the stigma of a rape conviction, that he attempted almost immediately to withdraw the plea he had entered, and that the plea was offered at a time of severe emotional stress. Appellate courts have traditionally declined to overturn a trial court's determination of witness credibility as "clearly erroneous." *See, e. g., Klein v. Smith, supra*, 559 F.2d at 192; *Palermo v. Warden, Green Haven State Prison*, 545 F.2d 286, 293 (2d Cir. 1976), *cert. dismissed*, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977); *United States ex rel. Fitzgerald v. LaVallee, supra*, 461 F.2d at 604; *United States ex rel. Jefferson v. Follette*, 438 F.2d 320, 322 (2d Cir. 1971). There is good reason for this.[13] Indeed, it is fruitful to recount here the explanation for the rule advanced by Judge Frank:

> For the demeanor of an orally-testifying witness is "always assumed to be in evidence." It is "wordless language." The liar's story may seem uncontradicted to one who merely reads it, yet it may be, "contradicted" in the trial court by his

---

12. For the relevant portion of the text of the indictment, *see* note 2, *supra*.

13. The wisdom behind this rule is amply demonstrated by the story of Lim Kwock Soon and Lim Kwock Min. In chronological order, *see*

*Lim Kwock Soon v. Brownell*, 143 F.Supp. 388 (S.D.Tex.1956); 253 F.2d 809 (5th Cir. 1958); 253 F.Supp. 963 (S.D.Tex.1966); 369 F.2d 808 (5th Cir. 1966).

**24**

manner, his intonations, his grimaces, his gestures, and the like—all matters which "cold print does not preserve" and which constitute "lost evidence" so far as an upper court is concerned. . . . "The best and most accurate record is like a dehydrated peach; it has neither the substance nor the flavor of the fruit before it was dried." It resembles a pressed flower. The witness' demeanor, not apparent in the record, may alone have "impeached" him.

*Broadcast Music Inc. v. Havana Madrid Restaurant Corp.*, 175 F.2d 77, 80 (2d Cir. 1949) (footnotes omitted). *See also Orvis v. Higgins*, 180 F.2d 537, 540 (2d Cir.), *cert. denied*, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950) (Frank, J.) (describing the demeanor of a witness as that "'evanescent factor which cannot come before us,'" *citing E. F. Drew & Co. v. Reinhard*, 170 F.2d 679, 684 (2d Cir. 1948)). To borrow a phrase recently employed by Judge Timbers to make the same point, "[Judge Neaher] was there. We were not." *Duckett v. Silberman*, 568 F.2d 1020, 1024 (2d Cir. 1978).

Accordingly, because we cannot say that Judge Neaher's findings of facts were "clearly erroneous," we must conclude that Harned's plea to the unexplained charge of first degree burglary was involuntary. Because Harned received inadequate notice of the offense to which he pleaded guilty the judgment of conviction was entered without due process of law.[14] The judgment of the district court is affirmed.[15]

**14.** Because of our disposition of this case under *Morgan*, the inapplicability of *North Carolina v. Alford*, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), becomes apparent. There the Supreme Court upheld a judgment of conviction against a defendant on an intelligent plea of guilty accompanied by a claim of innocence. The Court determined that an admission of guilt was "not a constitutional requisite to the imposition of criminal penalty." 400 U.S. at 37, 91 S.Ct. at 167. In *Alford*, however, the defendant had been made aware of the elements of the crime to which he pleaded guilty. 400 U.S. at 28–29, 91 S.Ct. 160. As Justice White explained in *Morgan*:

> Plainly, a defendant cannot "intelligently" reach that conclusion if he does not know the

elements of the crime to which he is pleading and therefore does not know what the State has to prove; and his ignorant decision to plead guilty under such circumstances is not a reliable indication that he is in fact guilty. 426 U.S. at 648–49 n.1, 96 S.Ct. at 2259 (White, J., concurring).

**15.** We cannot declare a belief that this constitutional error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The State argues that, at a minimum, the district court erred when it vacated the judgment of conviction as null and void. We disagree, and note that the Supreme Court followed this same path in *Morgan*.